JUAN RAMOS y su esposa MARÍA LUISA RODRÍGUEZ, demandantes y recurrentes, *v.* JUAN E. CARLO y UNITED STATES FIDELITY & GUARANTY COMPANY, demandados y recurridos.

Número: 12236.    Resuelto: 4 de mayo de 1962.

Sala integrada por el Juez Asociado Señor Belaval como Presidente de Sala y los Jueces Asociados Señores Hernández Matos y Santana Becerra.

EL JUEZ ASOCIADO SEÑOR SANTANA BECERRA emitió la opinión del Tribunal.

En esta acción de daños y perjuicios la Sala sentenciadora dio por probados los siguientes hechos ahora pertinentes:

(1) Que el 2 de diciembre de 1955 el demandado Juan E. Carlo era dueño de un almacén de provisiones que aparece en las fotografías marcadas *Exhs.* 1, 1(*a*) y 2, estando localizado dicho almacén en la intersección de las calles León y Muñoz Rivera de Mayagüez. Una de las puertas de entrada del almacén daba a la misma esquina de estas dos calles, teniéndose acceso a esta puerta por la escalera que aparece en las mencionadas fotografías.

(2) Que tanto la acera como el sardinel de la calle frente a la escalera de entrada de este almacén tienen un marcado declive, existiendo además en el sardinel una parrilla pluvial que también tiene la misma inclinación de la calle.

(3) Que el día del accidente, alrededor del mediodía, la demandante venía bajando de este a oeste por la calle Muñoz Rivera por el lado donde queda el almacén del demandado, y después de cruzar ella la calle León, al ir a subir a la acera frente a la entrada del almacén del demandado se enredó en unos flejes de unas cajas que había sobre el sardinel, cayendo de boca sobre la acera entre la escalera y un poste que aparece en las fotografías, sufriendo la demandante la fractura de la muñeca izquierda.

(4) Que en los momentos en que ocurrió el accidente hacía sol y la superficie de la carretera, del sardinel y de la acera estaban completamente secas, habiéndose probado además que la demandante caminaba despacio, que no estaba distraída, y que no había nada que impidiese el que la demandante pudiese ver fácilmente esas cajas y esos flejes que se encontraban tirados en el sardinel de esa esquina de las calles León y Muñoz Rivera.

(5) Además de lo anteriormente expuesto, la Sala sentenciadora hizo la siguiente conclusión: "Aunque no se probó en forma específica que las cajas y los flejes con que se enredó la demandante al sufrir este accidente hubiesen sido colocados en esa esquina por empleados del demandado Juan E. Carlo, sin embargo, a la luz de toda la prueba practicada,

y considerando especialmente el testimonio del testigo Juan Irizarry, nos parece que podemos válidamente concluir que esas cajas y esos flejes provenían del almacén del demandado y que las mismas fueron colocadas en ese sitio por sus empleados."

En su alegato de réplica los recurridos arguyen que la prueba no sostiene la anterior conclusión de hecho. En vista de tal planteamiento hemos considerado detenidamente la evidencia que aparece en el récord, y no nos cabe duda alguna de que esa conclusión de la Sala sentenciadora está sustancialmente sostenida con prueba. Resolviendo conflictos en la evidencia, la Sala obviamente no le dio crédito al demandado Carlo, ni a un testigo de los demandados quien declaró que en el lugar del accidente no vio cajas ni flejes al ocurrir la caída, y por el contrario, además de a la demandante y a su esposo, dio crédito a lo declarado por el testigo Juan Irizarry, persona aparentemente no interesada en el litigio. El testigo Irizarry dijo haber sido por varios años el encargado de la zona de limpieza del municipio de Mayagüez y haber tenido que intervenir en varias ocasiones con el demandado por tener frente a su establecimiento, en la esquina de la calle, barriles que desocupaba en su comercio, cajas con flejes, papeles y cartones y otros desperdicios del negocio. Varias veces le llamó la atención al demandado de que no debía tener eso allí porque estaba violando una ordenanza, y éste le decía que no tenía sitio donde poner la basura. Expresó el testigo que en los cuatro años que llevaba trabajando como encargado de la limpieza, el único caso que nunca pudo resolver fue el de este demandado. Dijo que siempre veía allí basura, escombros y flejes. El propio día del accidente por la mañana vio cajas y flejes, 3 ó 4 cajas y unos flejes en la misma esquina de la calle al lado de un poste del alumbrado. Manifestó que ya le estaba duro seguir llamándole la atención al demandado porque lo que corres-

pondía, y había decidido hacer, era denunciarlo. En la mañana siguiente al accidente y de ahí en adelante el testigo no vio más esa situación de basura y desperdicios allí. (¹)

Las fotografías a las que hace mención la Sala sentenciadora en sus conclusiones demuestran que el sitio donde ocurrió el accidente era un tanto incómodo para los peatones. El establecimiento del demandado hacía esquina, pero el ángulo quedaba destruido con un chaflán o corte diagonal un poco más del ancho de la puerta de entrada a la cual servía de pared, y proveía la base para una escalera de cuatro escalones hasta el piso del establecimiento. Mirando hacia su entrada, por el lado derecho de la edificación la acera está más o menos a nivel, pero por el lado izquierdo la acera tiene un pronunciado declive que viene a morir súbitamente en la misma esquina frente a la escalera. Así, el primer escalón tiene como unas ocho pulgadas de alto en su extremo derecho, pero prácticamente termina en nada en su extremo izquierdo. El borde de la acera en la esquina está redondeado y lo que existe es un arco. En la misma esquina, cuando aún no ha terminado el declive, hay una parrilla para el desagüe pluvial con una boca construida verticalmente en el canto de la acera por debajo de su superficie. En los alrededores de dicha parrilla y boca de desagüe la calle tiene también una inclinación hacia la esquina. En la esquina, un poco a la derecha mirando hacia el establecimiento, hay un poste del alumbrado cogiendo parte de la acera donde se une la que está a nivel con la que comienza a subir hacia el otro costado del edificio. No sabemos si lo anterior da una idea acertada de la condición no muy ideal del sitio para los peatones que cruzan la calle tratando de ganar acceso a la acera, según se obtiene ese cuadro al apreciar las fotografías, pero

---

(¹) El testigo de los demandados dijo que en la esquina, al lado de un poste de la luz y hacia la calle, había un barril. El demandado Carlo admitió que había ese barril vacío que *bajaría algún empleado;* y que la acera era estrecha.

evidentemente aquel no era el lugar para que se colocaran en la vía pública y en una acera los artefactos a que se refiere éste pleito, sin que se incurriera en una notable imprudencia y falta de cuidado al no preverse, como era fácil prever, que aquello podía causar daño a otro, y en efecto causó daño a la demandante.

La Sala sentenciadora no concluyó de manera afirmativa que el demandado actuó negligentemente. Sólo lo asumió a los efectos de despachar el caso a la luz de otras consideraciones. Debe ser claro que fue negligente en las circunstancias descritas, y que del acto que se le halló probado y de su falta de prever las consecuencias de dicho acto nació la obligación de su parte de resarcir a la lesionada. Arts. 1041, 1042, 1802, Código Civil, (ed. 1930).(²) La culpa o negligencia es la falta del debido cuidado, que a la vez consiste esencialmente en no anticipar y prever las consecuencias racionales de un acto, o de la omisión de un acto, que una persona prudente habría de prever en las mismas circunstancias. La responsabilidad por culpa o negligencia depende de la probabilidad de las consecuencias según son capaces de ser previstas por una persona precavida. De ahí que el caso fortuito, que de ordinario exime de responsabilidad, excluya el suceso que hubiera podido preverse. Art. 1058. O como expresa don José Castán hablando de las transgresiones jurídicas, "[S]e define, en efecto, la culpa o negligencia como la *omisión* de la diligencia exigible en las relaciones sociales, mediante cuya aplicación podría haberse evitado un resultado contrario a derecho y no querido. Para que haya negligencia basta con que el resultado haya sido previsto como *posible*

---

(²) Art. 1041.—31 L.P.R.A. sec. 2991: "Toda obligación consiste en dar, hacer o no hacer alguna cosa."

Art. 1042.—31 L.P.R.A. sec. 2992: "Las obligaciones nacen de la ley, de . . . . . , y de los actos y omisiones ilícitos o en que intervenga cualquier género de culpa o negligencia."

Art. 1802.—31 L.P.R.A. sec. 5141: "El que por acción u omisión causa daño a otro, interviniendo culpa o negligencia, está obligado a reparar el daño causado."

o *hubiese tenido* que ser previsto." (Énfasis del autor.) (³) Según expresión de Barassi que nos da Santamaría, (⁴), la necesidad de una convivencia social ordenada impone un deber general de corrección y de prudencia en relación con los demás ciudadanos, y el acto es ilícito en el sentido extra-contractual cuando viola los deberes generales de corrección social o de conducta correcta, deberes que no están escritos en los códigos pero que representan el presupuesto mínimo sobreentendido del orden de la vida social.

A pesar de sus conclusiones de hecho y de lo que fue un acto de culpa o negligencia que causó daño, la Sala sentenciadora se negó a obligar a reparar el daño causado. Resolvió como cuestión de derecho que la conducta y la negligencia del demandado no lo causó "ya que tanto las cajas como los flejes estaban claramente visibles, pudiendo haber la demandante fácilmente evitado este accidente con solamente desviarse un poco para evitar tener que pasar por el sitio donde se encontraban tiradas esas cajas." Que al optar por pasar por encima de esos flejes la demandante asumió el riesgo de su conducta debiendo atribuirse el accidente a su propia falta de prudencia, y dice más adelante: "El caso sería distinto si la demandante hubiese venido caminando por esa acera con intenciones de continuar su camino por la misma acera, ya que en ese caso y ante la perspectiva de tener que tirarse a la calle, abandonando la seguridad de la acera, no hubiese sido irrazonable que la demandante corriese el riesgo de pasar por encima de esos flejes, pero estando ya la demandante en la calle, y siendo lo mismo para ella el subir a la

---

(²) *Derecho Civil Español, Común y Foral*, 9a. ed., 1955, Tomo 1, Vol. 11, págs. 484 y ss. "La esencia de la culpa", dice, "está en la falta de diligencia y previsión que supone en el autor del acto." *Op. cit.* Tomo 3, 8a. ed., 1954, pág. 146.

Todo acto u omisión que causa daño a tercero se presume, según Puig Peña, que es antijurídico, o sea, contrario a derecho o ilícito, *Derecho Civil*, Tomo IV, Vol. 11, pág. 571, y dejará de serlo cuando concurra a su favor una causa de exclusión de la antijuricidad.

(⁴) *Comentarios al Código Civil* (1958) Tomo 2, pág. 947.

acera contigua al almacén del demandado por la misma esquina o un poco fuera de la esquina, no cabe duda de que la demandante se expuso innecesariamente a sufrir esta caída al optar por subir a la acera por el sitio más peligroso''; citando *Quiñones* v. *Colom*, 71 D.P.R. 599.

En la propia línea de pensamiento que siguió la Sala sentenciadora al establecer el derecho aplicable, la inversa parece ser más lógica. De ordinario, una persona caminando por la acera protegida ella por la seguridad que la acera ofrece contra los riesgos del tránsito, tiene más oportunidad y más tiempo de reflexionar y de discurrir para obviar un obstáculo o un peligro que se le presenta y puede, inclusive, detenerse en firme sin otros riesgos hasta que la condición quede apartada o se elimine; por lo que sería *menos razonable y más imprudente* de su parte el asumir un riesgo en comparación a la persona que cruza una vía pública, cuya prudencia y sentido de conservación le dicta que debe abandonar lo antes posible el sitio de peligro que es la calle y ganar el sitio seguro que es la acera, y cuya atención en ese momento la ocupa el riesgo en que se encuentra y no el que pueda sobrevenirle en un sitio en que de ordinario ella no espera que le surja y tiene derecho a confiar en que no habría de surgirle. ■

A tenor de la prueba, la conclusión de la Sala de instancia que imputó imprudencia a la demandante a tal extremo de derrotar su reclamación no encuentra apoyo racional en los hechos según la versión del accidente que se dio por probada. Hay hechos adicionales en el récord demostrados por la prueba de ambas partes, no disputables, que dan un cuadro más acabado de todas las circunstancias allí presentes. En la otra esquina de la calle por donde venía la demandante había un edificio en construcción rodeado de una verja o valla de zinc que es corriente en tales casos. Esto impedía el caminar por la acera y el que la demandante antes de cruzar lo pudiera hacer desde la acera opuesta, desde donde

con mayor reposo hubiera podido observar la acera contraria a la cual se dirigía y formar los juicios optativos a que se refiere el fallo. Debido a la construcción también, en la calle que cruzaba la demandante había piedras, escombros y pedazos de varillas lo que indudablemente la obligaba a estar atenta además de a los vehículos y demás riesgos del tránsito, a estos otros peligros potenciales. Observando las fotografías el sitio más fácil para subir a la acera es donde termina el declive y se eleva el poste de la luz, pero en ese sitio según la prueba aportada por los demandados mismos, había colocado un barril al lado del poste hacia la calle.

La demandante, mujer de 60 años, salía de su trabajo al mediodía hacia su hogar y describe el hecho de esta manera:

"En el momento que crucé así y voy a poner el pie en la acera de don Juan Carlo, había un fleje despegado de unas cajas, *que se parecía a la acera y yo no lo vi y me enredé* y me caí en la acera.

"

"Me enredé en unos flejes que había de unas cajas, flejes que había en la acera. *No noté el fleje en que me enredé porque era del mismo color de la acera.*

"

"P.—Dice que se enredó, ¿en qué? R.—En un fleje de unas latas, de unas cajas, que estaba encima de la acera. P.—¿Las cajas dónde estaban? R.—En el sardiné; *pero los flejes estaban encima de la acera, que yo no los vi.* P.—¿Entonces las cajas estaban en el sardinel y los flejes encima de la acera? R.—Sí, señor. P.—¿Entonces fue con los flejes que se enredó? R.—Sí señor.

"

[Ddos.] "P.—¿Por qué acera usted bajaba cuando usted iba por la calle Muñoz Rivera, por la acera derecha o por la izquierda? R.—Por la izquierda; *pero iba por la calle porque tenían una cerca de zinc atorando.* . . . . P.—¿Antes de usted llegar a la esquina del accidente, usted venía por la calle? R.—Sí, porque estaba una cerca de zinc, entonces al montar el pie en la acera. . . .

"

"Dígame, ¿qué precauciones tomó usted para no caerse?

"R.—Bueno, *cuando yo vine a percatarme estaba enredada en el fleje.* P.—¿Usted va mirando para atrás o hacia adelante? R.—Adelante, *pero como los flejes eran casi del mismo color de la acera.* . . . . P.—¿De qué color es la acera? R.—Como gris, como cemento. P.—¿Y de qué color eran los flejes? R.—Del mismo color."

Después de declarar que no venía leyendo, ni distraída ni traía preocupación alguna:

"—¿Y por qué usted *no se desvió de los flejes?* R.—*Si los hubiese visto no me hubiera caído."*

Reiteró siempre la demandante a través de un intenso contrainterrogatorio sin que se le contradijera que los flejes estaban encima de la acera aunque las cajas de que pendían estaban en el sardinel, que al montar el pie en la acera se enredó en ellos, que no los vio y que eran del mismo color de la acera. En efecto, tenemos a la vista un fleje admitido en evidencia que la demandante y su esposo tomaron del lugar del accidente. Es de metal flexible bastante duro, de 3 pies 3 pulgadas de largo, ¼ de pulgada de ancho y su color gris se asemeja mucho y se confunde fácilmente con el gris típico de las aceras de cemento.

Los demandados no contradijeron la anterior prueba ni intentaron demostrar con otra que dichos flejes eran claramente visibles o distinguibles, o que la demandante deliberadamente optara por pasar sobre ellos conociendo su presencia o habiendo tenido razonable oportunidad de conocerla o de ser advertida, o que en alguna otra forma ella actuara desprevenida o distraídamente hacia su propia seguridad. Su teoría y su prueba—la declaración de un solo testigo que dijo haber presenciado la caída—fue al efecto de que en aquel sitio no existían dichas cajas ni flejes ni objetos por el estilo. Pero a esta evidencia la Sala de instancia no le dio crédito al establecer como un hecho probado que la demandante al ir a subir a la acera se enredó en unos flejes de cajas que había sobre el sardinel cayendo de boca. A la luz de la prueba no desvirtuada, la conclusión de hecho de la Sala

sentenciadora al efecto de que nada había "que impidiese el que la demandante pudiese ver fácilmente esas cajas y esos flejes" no tiene el necesario apoyo en la evidencia, ni como un hecho directamente probado, ni como una inevitable inferencia del hecho declarado por la propia demandante de que al ocurrir la caída hacía sol y era claro, la calle estaba seca y ella andaba despacio y no venía distraída, contra prueba persuasiva y no desvirtuada de que aún en las circunstancias descritas ella no pudo percatarse de los flejes. Se cae, por consiguiente, la conclusión de derecho basada en esa de hecho, al efecto de que la demandante pudo *fácilmente* evitar el accidente *no optando* por pasar por encima de los flejes, y que al así *optar* asumió el riesgo de su conducta siendo la causa del accidente su propia falta de prudencia. Puede aceptarse que en las circunstancias de este caso y para una persona de normal visión las cajas en sí eran o podían ser visibles a cierta distancia, pero la demandante no alega que ella chocara con las cajas o que se hiciera daño con las mismas. Por el contrario, estando los flejes unidos o cercanos a las cajas, el fenómeno visual ordinario es que la vista tienda a posarse en conjunto sobre el objeto de mayor tamaño, a menos que ya se venga con la idea en mente de fijar la atención en algún punto o detalle particular. La presencia de las cajas pudo ser precisamente un hecho adicional que no permitiera a la demandante el percatarse a tiempo de la existencia de los flejes.

Por el récord, en las circunstancias de este caso a la demandante no se le puede imputar que incurriera en grado alguno de imprudencia que derrotara su derecho a reclamar. Pero independientemente de la falta de base de hecho, el fallo tampoco sería aceptable por la doctrina de derecho en que se funda, a la luz de criterios expresados por este Tribunal y a la luz de una doctrina que represente un balance más apropiado de las normas de responsabilidad que se deben imponer a los peatones en las aceras públicas. Cfr. *Montval*

*Vda. de Cuevas* v. *López Hnos.*, 41 D.P.R. 431 (un caso gemelo, en que la lesionada se enredó en unos alambres tirados en la acera contigua por un establecimiento fabricante de cajas, y en que se alegó sin prosperar que ella asumió el riesgo porque la circunstancia le era "conocida" y pudo "*evitar*" la caída) ; *Davidson* v. *Hettinger & Co.*, 62 D.P.R. 301, pág. 306 y ss.; *Font* v. *Viking Construction Corporation*, 58 D.P.R. 689, págs. 697 y ss.; *Martínez* v. *Báez*, 63 D.P.R. 783; *Echevarría* v. *Despiau*, 72 D.P.R. 472, pág. 477; *Palmer* v. *Barreras*, 73 D.P.R. 278, pág. 281 (se dan los elementos de la asunción de riesgo) ; *Vélez* v. *La Capital*, 77 D.P.R. 701, pág. 708.

Sostener el fallo en su razón de derecho equivaldría a establecer la doctrina que un propietario adyacente o cualquier vecino, en menosprecio de su deber general de corrección para con los demás ciudadanos, como diría Barassi, puede crear sin responsabilidad civil alguna, condiciones peligrosas en las aceras, imponiendo la obligación al peatón que camina por ellas de ser un perenne vigilante de su seguridad.  Un transeunte en las aceras debe observar un grado normal de cuidado en las circunstancias concurrentes, pero no está obligado a caminar en un constante acecho y descubrimiento de trampas y condiciones peligrosas producto de la imprudencia de otro.  Como se dijo en el caso de *Hettinger*, ante, un viandante "no tiene que ir mirando continuamente hacia el suelo para evitar todo posible accidente debido a la negligencia de una tercera persona" . . . . . ni tampoco "tiene necesariamente que transitar por otra calle que aquélla en que ocurrió el accidente, aun cuando conozca las condiciones peligrosas de la misma".  El caso de *Quiñones* v. *Colom*, citado por la Sala de instancia es claramente distinguible de la situación aquí envuelta.

Las aceras públicas constituyen o deben constituir un lugar de privilegio para los peatones en la seguridad de sus personas.  Lo mismo han de ser para el niño inexperto que

camina distraído, como para el adulto más consciente que va rumiando sus preocupaciones; para el de vista perfecta y el corto de vista; para el ágil y alerta como para el decrépito. Con el aumento en escala vertiginosa del tránsito motorizado y el peligro creciente en la congestión de las vías públicas, lo dicho es hoy de mayor necesidad que cuando se resolvió *Montval* en 1930 y se decidieron algunos de esos otros casos.(5) ▮

Concluimos que la demandante no incurrió, como cuestión de hecho ni como cuestión de derecho, en tipo alguno de negligencia que la llevara a asumir la responsabilidad de su caída, y sobre este fundamento resolvemos que los demandados tendrán que indemnizarla.

Pero asumiendo(6) que la prueba permitiera concluir que ella contribuyó con algún grado de imprudencia o de falta de diligencia, aún así, a nuestro entender no procedía dentro de nuestro ordenamiento civil positivo, exonerar a los demandados negligentes de total responsabilidad. Ello debía ser así porque el Art. 1042 del Código Civil nuestro (1089 del español) impone la obligación por los actos u omisiones en que intervenga *cualquier* género de culpa o negligencia. El que comete el acto u omisión culposo o negligente debe siempre responder, en la *medida* que sea, pero no ha de quedar exonerado del todo.(7)

Hablando en general sobre los actos y hechos jurídicos, don José Castán lo explica de esta manera: "Mientras que la culpa contractual es graduable y está basada sobre la

---

(5) Por ello choca la indiferencia con que se permite—cosa observada cotidianamente en el ir y venir,—que establecimientos comerciales, en uso privado de la propiedad pública, desplieguen permanentemente durante el día en las aceras mercancía de gran bulto y tamaño, a veces quedando apenas el espacio suficiente al borde de una acera estrecha para el paso de una persona con grave riesgo de la seguridad de los ciudadanos; observación hecha, inclusive, en las vías de mayor congestión de tránsito.

(6) A los fines de la decisión del caso esta parte puede tomarse, si se quiere, como *dictum*.

(7) Al expresar esto no tenemos para nada en mente la Ley Núm. 28 de 9 de junio de 1956.

distinción de sus dos matices, la culpa propiamente dicha y el dolo, en la extracontractual, por el contrario, no tienen interés ni esta distinción ni las graduaciones de la culpa. El autor del acto ilícito *responde siempre del daño*, ya lo haya producido dolosamente o por *simple negligencia y cualquiera que sea su grado*, pues se tiene en cuenta hasta la más ligera falta (1), en atención a que esta clase de culpa afecta más bien que al interés privado, a relaciones de interés social. (1), De aquí la regla romana: *'In lege Aquilia et levissima culpa venit.'*. (Énfasis adicionado.) *Op. cit.* Tomo 1, Vol. 2, 9na. ed., pág. 490. Y luego, Tomo 4, 8va. ed., pág. 826, refiriéndose ya específicamente a la aquiliana, repite: "Tenemos ya dicho que la teoría de las graduaciones de la culpa no tiene interés en la extracontractual, pues el *autor* del acto ilícito *responde siempre* del daño, cualquiera que sea el grado de la falta. Así, el art. 1.089 de nuestro Código habla de 'cualquier género de culpa o negligencia.' Por lo demás, la autoridad judicial habrá de apreciar la falta de diligencia, tratándose de esta responsabilidad, *lo mismo que* en la contractual (. . . . .), teniendo en cuenta las circunstancias de cada caso concreto." (Énfasis adicionado.) En igual sentido se manifiesta Roberto de Ruggiero, —*Instituciones de Derecho Civil*, —Tomo 2, Vol. 1, 4ta. ed. italiana, pág. 130: "estas categorías [graduaciones] tienen solamente importancia en orden a la culpa contractual, no a la aquiliana, en donde el mayor rigor establecido por la ley para declarar la responsabilidad plena e íntegra por todo acto culposo (arts. 1.751 y siguientes), incluso el más leve (. . . . .); excluye la posibilidad de graduar la responsabilidad" . . . . . . ; y así también concurren los demás tratadistas.

El problema recae entonces en el área de la causación, bajo cualesquiera de las teorías que se discuten, próxima, adecuada o la de la equivalencia, en que, según observa Castán, se toman en cuenta todos los antecedentes que constituyen

faltas en relación necesaria con el daño a los efectos de una participación gradual de la responsabilidad, a menos que *una sea tan grave* que *absorba* a todas las demás. En sus anotaciones comparadas al *Derecho de Obligaciones* (Ennecerus) González y Alguer, Tomo II, Vol. 1, pág. 84, comentan que ningún precepto positivo español es un serio obstáculo a la doctrina que dé todo margen de libertad al árbitro judicial para repartir equitativamente el daño cuando concurren la culpa del agente y la del perjudicado. "Lo entendemos así", dicen ellos, "no sólo porque es una consecuencia lógica de los principios sobre el nexo causal—que se cifra en reconocer como causa aquella condición que se halla en conexión adecuada con el resultado dañoso (. . . . .) y que, por tanto, no excluye la posibilidad de la concurrencia de dos condiciones que impliquen esa conexión adecuada del daño—sino también porque los tribunales están facultados para moderar, según los casos, la responsabilidad procedente de culpa (art. 1.103) [art. 1056 Código Civil nuestro (*)] y esta facultad no puede decirse se dé solamente en relación a las obligaciones contractuales. Moderada de esta suerte la responsabilidad del agente y reducido en proporción su deber de indemnizar, implícitamente resulta repartido el daño con el perjudicado. Por consiguiente, creemos aplicable al derecho español la doctrina desenvuelta en el texto, bastando con que se solicite indemnización para que el tribunal pueda, de oficio, moderar la responsabilidad. (Cf. S. 14 mayo 1920.)" Y Castán, que cita a González y a Alguer, señala también las Sentencias de 18 de enero de 1936, y de 10 de julio de 1943 que ya hablan de la posibilidad de que la concurrencia de culpa pueda ser *compensada* o *compartida* entre el agente y el perjudicado y las de 24 de mayo de 1947 y 13 de marzo de 1953, al efecto de que para que la concurrencia de culpa

(*) "La responsabilidad que proceda de negligencia es igualmente exigible en el cumplimiento de toda clase de obligaciones, pero podrá moderarse por los tribunales según los casos."

pueda ser compartida deben ser de igual grado e idéntica virtualidad jurídica. *Op. cit.* T. 3, pág. 173; T. 4 pág. 829.

Antonio Borrell Macía en su tratado sobre *"Responsabilidades Derivadas de Culpa Extracontractual Civil"*, (2da. ed. 1958) págs. 95–101, no tiene duda de que "no toda imprudencia de la víctima librará de responsabilidad al autor de un daño que haya obrado con culpa" y que para ello procede examinar la mayor o menor intensidad de la culpa; el mayor o menor deber de vigilancia entre los dos autores del hecho. Analizando la jurisprudencia del Tribunal Supremo en cuanto a si de darse concurrencia de culpas procede la compensación, expone: "No obstante, en sentencia de 14 de octubre de 1957 declara que los tribunales pueden moderar la responsabilidad del agente y reducir en proporción su deber de indemnización repartiendo el daño con el perjudicado. La influencia de la culpa del perjudicado—añade— se ha reconocido reiteradamente por la jurisprudencia como una derivación de la necesidad del nexo causal entre el acto que obliga a indemnizar y el daño (sentencias de 7 de marzo de 1902, 16 de junio, 22 y 23 de diciembre de 1905, 13 de junio de 1923, 5 de mayo de 1925, 22 y 27 de diciembre de 1928 y 26 de octubre de 1930), y si bien la sentencia de 21 de diciembre de 1910 concurriendo culpa apreciada en ambas partes imputa los daños al agente, pese a la realidad de una cierta imprudencia del lesionado, las sentencias de 18 de enero de 1936 y 10 de julio de 1943, reconocen la posibilidad de que la concurrencia de culpa puede ser compensada o compartida entre el agente y el perjudicado. A igual conclusión se llega utilizando la facultad que compete a los tribunales para ponderar, según los casos, la responsabilidad procedente de culpa (art. 1.103 del Código Civil) por no poderse considerar esta facultad privativa en relación a las obligaciones contractuales, con lo que moderada de esta suerte la responsabilidad del agente y reducido en proporción

su deber de indemnizar, implícitamente resulta repartido el daño con el perjudicado . . . el Tribunal a quo que, en uso de sus facultades ha repartido equitativamente el daño por concurrencia de la culpa del agente. . . . En sentido similar se pronuncia la de 19 de junio de 1957." Y véase el análisis diáfano de esta cuestión que nos hace Leonardo Colombo, *Culpa Aquiliana*, págs. 179–185, y que en gran parte fue reproducido por el Juez señor Ortiz con la concurrencia del Juez señor Belaval en *Irizarry* v. *Pueblo*, 75 D.P.R. 786 a las págs. 809 y sigtes. La doctrina francesa ha seguido igual encauzamiento. Entendemos, dentro de nuestro ordenamiento civil positivo, que aún cuando la demandante hubiera incurrido en falta de diligencia, no era procedente tampoco el exonerar de toda responsabilidad a los demandados culposos.

Procede que dictemos la sentencia que debió haber dictado la Sala sentenciadora. La demandante sufrió la fractura de la cabeza del hueso radio del brazo izquierdo, la muñeca. Los primeros meses tuvo fuertes dolores físicos que no la dejaban dormir e hinchazón de la mano, pasando por diversos tratamientos. No pudo coser más ni hacer otros trabajos. Un certificado—prueba de ambas partes—expedido en abril 11, 1956, algo más de 4 meses después de la fractura, hace constar que la condición de la mano izquierda estaba mejorada y podía cerrar la mano lo suficiente para agarrar un objeto del tamaño del palo de una escoba, y que la hinchazón había cedido aun cuando había queja de dolor. De hacer sus ejercicios fielmente no debería tener más de un 50 por ciento de incapacidad. A la fecha del juicio había de un 40 a un 50 por ciento de incapacidad en la función de agarre de la mano. Existía una contracción con el músculo un poco atrofiado y un poco de anquilosis al levantar el brazo. Al ocurrir el accidente la codemandada U. S. Fidelity & Guaranty Co. había expedido una póliza a favor del demandado Carlo cubriendo responsabilidad pública hasta un límite de $5,000.

Por los fundamentos expuestos, se revoca la sentencia recurrida y se dictará otra condenando a los demandados Juan E. Carlo y U. S. Fidelity & Guaranty Co.; a satisfacer solidariamente a los demandantes la cantidad de $6,800 por todo resarcimiento de daño en el accidente aquí envuelto debiendo responder la codemandada U. S. Fidelity & Guaranty Co., hasta la suma de $5,000; las costas del procedimiento incluyendo las de apelación, y $500 de honorarios de abogado ante la Sala de instancia.

Número: 2867.   Resuelto: 4 de mayo de 1962