PASCUAL MÁRQUEZ ET AL., demandantes y recurrentes, *v.* PUERTO RICO TELEPHONE CO., demandada y recurrida.

*Número:* 92      *Resuelto:* 20 de mayo de 1963

*Guillermo Bauzá,* abogado de los recurrentes; *Rivera Zayas, Rivera Cestero & Rúa* y *Antonio Montalvo Nazario,* abogados de la recurrida.

Sala integrada por el Juez Asociado Señor Belaval como Presidente de Sala y los Jueces Asociados Señores Hernández Matos y Santana Becerra.

EL JUEZ ASOCIADO SEÑOR SANTANA BECERRA emitió la opinión del Tribunal.

Los demandantes reclamaron daños de la Puerto Rico Telephone Co. con motivo de un accidente de automóvil ocurrido en la noche del 25 de mayo de 1957 en el Km. 79 Hm. 7 de la Carretera # 3, mientras el vehículo corría de Humacao hacia la playa de Humacao. Se alegó en la demanda que en ese sitio el conductor se enfrentó súbitamente con un cable tensor que cruzaba la carretera en el cual se enredó el vehículo, se perdió el control de éste y el automóvil cayó por un risco con sus ocupantes. También se alegó que al ocurrir el accidente la demandada tenía el exclusivo dominio y manejo del referido cable tensor y del poste que estaban caídos en el lugar, y que el poste estaba podrido, partido cerca de su base.

Visto el caso en los méritos la Sala de San Juan del Tribunal Superior dictó opinión y sentencia declarando sin lugar la demanda. La Sala sentenciadora hizo la siguiente exposición de los hechos:

"1.—El día 25 de mayo de 1957, tarde en la noche, el demandante Pascual Márquez conducía un automóvil Chevrolet de su propiedad por la carretera de Humacao a su Playa en dirección a ésta. Al llegar a cierto sitio de la carretera, en un recodo o curva de la misma, dicho conductor se topó con un cable tendido a lo ancho de la carretera. Al percatarse de ello, el conductor trató de desviar su vehículo hacia su izquierda pero no obstante dicha maniobra el cable se enredó con el vehículo en forma tal que su

conductor perdió el control sobre el mismo con el resultado de que dicho vehículo se desvió hacia su derecha cayendo por un barranco allí existente con las consecuencias que de inmediato se expondrán.

.        .        .        .        .        .        .

[Siguen conclusiones en cuanto a los daños sufridos por los ocupantes.]

"4.—El cable a que se refiere el apartado 1. *ante* es un cable tensor que sostenía desde un poste al lado derecho de la carretera yendo desde Humacao a su Playa otro poste al otro lado de la carretera usado éste para sostener alambres o líneas de la red telefónica pertenecientes a y bajo el control de la demandada Porto Rico Telephone Company. Ocurrido el accidente descrito se pudo apreciar que el poste sostenedor o ancla del referido cable tensor a la orilla derecha de la carretera estaba partido por la parte de abajo quedando la parte superior, con el alambre tensor unido, tendido sobre la orilla de la carretera. El poste sostenedor era bastante nuevo, estaba creosotado y en buenas condiciones.

"5.—La prueba no demuestra la causa de la rotura del poste sostenedor del cable, ni cuando ocurrió dicha rotura. La prueba si demuestra que entre las nueve y media o diez de la noche del accidente había paso expedito por la carretera y que el cable tensor no obstruía la misma. El accidente ocurrió antes de las once de la noche. Nada hay en la prueba al efecto de que cualquier condición defectuosa de los postes o del cable tensor, ocurrida necesariamente después de las nueve y media o diez de la noche del accidente, le fuese comunicada a, o viniese en conocimiento de, la demandada en forma alguna."

Con esos hechos la Sala hizo las siguientes conclusiones de derecho:

"1ra.—La prueba, según la dejamos resumida, no demuestra negligencia específica alguna por parte de la demandada Porto Rico Telephone Company. El solo hecho de la rotura del poste sostenedor del cable tensor y consecuente caída de este sobre la carretera no evidencia negligencia por parte de la demandada en ausencia de prueba de a) estado defectuoso de las líneas telefónicas en la localidad, específicamente del poste sostenedor y/o del cable tensor; b) de falta de la debida inspección de las líneas telefónicas; y c) conocimiento por la demandada de la

rotura del poste y caída del cable tensor la noche del accidente con tiempo suficiente para corregir dicha situación.

"2da.—La evidencia del caso no permite, por otro lado, inferir tal negligencia de la demandada bajo la regla *res ipsa loquitur*. [citas]

"3ra.—No habiendo demostrado la prueba, ni directamente ni por razonable inferencia, negligencia por parte de la demandada como causa del accidente descrito y consecuentes daños a los demandantes, procede se desestime la acción en todas sus partes."

Hubo prueba de ambas partes en cuanto a la condición o estado del poste caído. El Sargento de la Policía Sr. Emilio Moryet, quien realizó una investigación inmediata en el lugar de los hechos, declaró, a preguntas de los demandantes:

> "P ¿Usted podría informarle al Tribunal si usted examinó esa parte del pedazo caído y el pedazo de pie?
>
> R Si, lo examiné.
>
> P ¿Dígale al señor Juez si usted notó, en relación con la contextura de la madera, algo que le llamara la atención?
>
> R No se notaba ni muy podrida ni muy sana.
>
> P ¿Cuando dice ni muy podrida qué quiere decir?
>
> R Que estaba en estado regular en cuanto al estado del tiempo.
>
> P ¿Usted examinó bien la fibra?
>
> R Si señor.
>
> P ¿Usted sabe lo que es madera podrida?
>
> R Si señor.
>
> P ¿Sobre esa cuestión, describa el poste según el examen que usted hizo?

SEÑOR JUEZ:
> El acaba de declarar que estaba podrido.

TESTIGO:
> No estaba en estado muy avanzado de podredumbre pero estaba un poco podrido.

LIC. RÚA:
> Objeción.

SEÑOR JUEZ:

Esa es una cuestión que una persona puede informar si estaba podrido o le parece viejo, no se necesita peritaje para eso. Puede declarar.

LIC. BAUZÁ:

P ¿Examinó usted el vehículo?

R Si señor.

.     .     .     .     .     .     .     .

A preguntas de la demandada:

"P ¿La base del poste representa el exhibit 6(c) y 6(d)?

R Si señor.

P ¿Usted lo examinó esa noche con la linterna eléctrica, y lo miró, según usted dijo ayer tarde—puede modificarlo si quiere—ni muy podrido ni muy bueno?

R La parte que quedaba en la superficie.

P ¿Cuál parte, mostrándole el exhibit 6(d), señale cuál es la parte a que usted se refiere.

R En la circunferencia alrededor del poste encontré que había una parte corroída pero en el interior la fibra estaba bastante bien.

P ¿Qué color tenía la parte corroída?

R Estaba negruzca.

P ¿En la parte de afuera se veía negruzco?

R Entre la superficie y el centro había una parte que se veía negruzca.

P ¿Si este lápiz fuera el poste, por fuera se veía negruzco y corroído?

R Hasta cierta profundidad del poste en el centro, como una espiga de cierto diámetro estaba bien.

P ¿Qué diámetro sería ese a que se refiere?

¿Así es el poste de ancho?

R Bastante ancho.

P ¿En el centro, en el interior, la parte que se veía bastante bien qué diámetro tenía?

R Dos o tres pulgadas hacia adentro.

SEÑOR JUEZ:

P ¿La parte del la fibra interior que usted dice que estaba en buenas condiciones, cuántos diámetros tendría esa parte?

R  Cinco o seis pulgadas.

. . . . . . . .

A preguntas de los demandantes:

"P ¿Cuando usted describía el poste tal como usted le ilustró al distinguido compañero, al partir este lápiz, simulando que este fuera el poste, usted dice que en el interior tenía varias pulgadas supuestamente de fibra buena?

R  Si señor.

P ¿Como estaba la fibra exterior?

R  Estaba corroída, desmenuzada.

P ¿Podría decir si notó algo más sin llegar usted a conclusiones, describiendo la parte interior, al decir que estaba desmenuzada, qué usted quiere decir?

R  Que estaba bastante podrido."

El testigo Gregorio González Ortiz quien dijo vivir a 25 metros del lugar y que había sido llamado para que prestara auxilio, manifestó:

"P ¿La noche del accidente durante el momento en que usted intervino poniendo el poste en esa posición, usted examinó el poste?

R  Si señor.

P  Describa cómo estaba el poste?

R  El poste mostraba que estaba podrida la cáscara por encima.

P ¿Usted tocó el poste?

R  Si señor.

. . . . . . . .

SEÑOR JUEZ:

P ¿Usted lo observó al tocarlo?

R  El poste estaba partido con unas astillas.

LIC. BAUZÁ:

P ¿Cómo estaba la superficie del poste?

R  Podrida.

. . . . . . . .

A preguntas de la demandada:

"P ¿Usted examinó el poste por fuera?

R  Si señor.

P ¿Lo encontró negruzco?

R Como podrido.

P ¿Por dentro cómo estaba?

R Con fibras.

P ¿Estaba bien?

R No me di cuenta.

P ¿De qué color tenía las astillas del centro?

R Creosotado.

P ¿Ese color creosotado cómo es,—mire ese color alli arriba —era un color así?

R Sí señor.

P ¿Eso es negro?

R Sí señor.

P ¿Ese era el color que tenía la fibra?

R Sí señor.

P ¿Por eso cree que estaba podrida la parte de afuera?

R Se le salían las cáscaras al poste.

P ¿Por eso usted cree que estaba podrido?

R Sí señor.

P ¿No tenía polilla?

R No me fijé.

. . . . . . . .

[Demandante]

"P ¿Cuando usted dice que el poste estaba podrido, usted sabe lo que es estar un pedazo de madera podrido?

R Sí señor.

. . . . . . . .

"P ¿Usted dice que estaba podrido?

R Sí señor."

Sobre este mismo aspecto de la condición del poste, por parte de la demandada declaró el ingeniero, Sr. Arístides Castro González, quien dijo que se personó en el lugar y examinó la base del poste allí enterrada el 6 de marzo de 1958, diez meses después.

"P ¿Usted vio allí un objeto que se señala por este hombre fotografiado en el Exhibit 6(c)?

R  Sí señor.

P  ¿Qué era eso?

R  La base del poste creosotado.

P  ¿Usted lo examinó?

R  Sí señor.

P  ¿Qué características mostraba ese poste?

SEÑOR JUEZ:

P  ¿La base es el tocón, lo que quedó del poste que cayó?

R  Sí señor, el poste era un poste creosotado, fue usado un preservativo para evitar que se destruyera.

P  ¿Cómo se hace eso?

R  Ese es un proceso en donde cogen un poste después que lo sacan de los molinos, lo someten a presión, primero le sacan todo el aire, le vacían las células y entonces le meten la creosota interior.

P  ¿Y la parte exterior?

R  La parte exterior es más negra porque al quitar la presión siempre queda aire dentro de las células y empuja el creosol hacia arriba.

.    .    .    .    .    .    .    .

"P  ¿Qué características presentaba el tocón?

R  Se veía bien.

.    .    .    .    .    .    .    .

"P  ¿Por el examen que usted hizo como perito y por lo que usted observó personalmente, ese tocón estaba en buen estado?

R  Estaba en buen estado, no tenía polilla y no estaba podrido.

P  ¿En que forma estaba?

R  El tocón todavía retenía bastante creosota, en la madera y tenía toda la creosota interior.

P  ¿Mostraba que estaba bastante nuevo?

R  Estaba bastante nuevo.

.    .    .    .    .    .    .    .

"P  ¿Estaba firmemente adherido a la tierra?

R  Sí señor.

[Por las fibras, el testigo concluyó que el poste había fallado por tensión o fuerza lateral que lo había chocado.]"

El Sr. Tomás Figueroa López, empleado de la demandada y supervisor general de casos especiales, manifestó que trabajaba para la fecha en el Distrito de Fajardo y Humacao; que tuvo ocasión de intervenir con el poste y con el tronco en julio 12 de 1957 cuando se le notificó por su jefe que fueran "a inspeccionar algo porque alguien reportaba que había un cable caído en el piso y alguien había tumbado el palo."

"P  ¿Usted examinó el tronco?
R  Sí señor.
P  ¿En qué estado estaba el tronco?
R  Parece que había recibido un impacto y se había partido como a diez y ocho pulgadas de la tierra, y estaba deshilachado.
P  ¿Estaba podrido el tronco?
R  No señor.
P  ¿Tenía polilla?
R  No señor.

.      .      .      .      .      .      .

"P  ¿En qué estado estaba?
R  Estaba muy bien conservado porque yo había pasado anteriormente por allí y los postes de esa parte que estaban podridos cuando vino el ciclón destruyó como ciento y pico de postes.
P  ¿Qué ciclón?
R  El de Santa Clara.
   [se pide al Tribunal que tome conocimiento judicial de que el ciclón de Santa Clara fue en septiembre de 1956.] Incomunicó totalmente aquella parte.
P  ¿Destruyó postes?
R  Los que estaban podridos los echó al suelo.

SEÑOR JUEZ:
P  ¿De qué se podrían?
R  Se podrían debido a la inclemencia del tiempo.
P  ¿Aunque estén creosotados se pudren?
R  Sí señor.
P  ¿Esos que usted dice que se pudrieron estaban creosotados?
R  Sí señor. Eran muy viejos.

P ¿Qué promedio?

R Hace cerca de treinta a treinta y cinco años que se descontinuaron los que eran cuadrados.

P ¿Ese que se partió, cómo era?

R Redondo.

P ¿Qué tiempo tendría?

R Como cinco o seis años de servicio, era un poste de clase número 7, negro totalmente y se arregló como se hace en todos los de la planta.

P ¿El ciclón de Santa Clara no afectó el poste?

R No señor, se conservó muy bien y después del ciclón tuvimos que mandar dos brigadas para poner los postes."

El Sr. Ernesto Colón, policía insular, dijo que examinó el poste aquella noche, estaba negro por fuera y por dentro del color de la madera y no lo vio podrido. Al igual que los testigos de los demandantes, manifestó que el poste no tenía golpes.

La Sala sentenciadora, a la luz de la evidencia en el récord de una y otra parte—según evaluara la misma,—no concluyó que la caída del poste fue el resultado de la acción o impacto de un agente exterior, ya fuera el propio vehículo envuelto o cualquier otro agente extraño. No debemos considerar que el hecho quedó implícito por el fallo negando responsabilidad de la demandada, ya que se produjo prueba tendente a demostrar afirmativamente que no existió tal intervención extraña. En esas circunstancias, en la determinación de si hubo o no negligencia por parte de la demandada no afecta, por lo tanto, el factor de que ella pudiera o no tener conocimiento de la rotura y caída del poste con tiempo suficiente para corregir la situación.

El récord no permitiría concluir tampoco que el poste pudo quebrarse o se quebró como consecuencia del empuje del automóvil mismo al enredarse en el cable caído. Ha de ser así porque de la prueba no disputada surge de manera concluyente que dicho cable cruzaba la carretera a unos 18 pies de altura perpendicular a sus lados y unido por sus extremidades a la parte superior de dos postes uno a cada lado del camino. Al producirse el hecho el cable se extendía de mayor a

menor (a manera de hipotenusa), la parte más baja hacia el lado derecho por donde discurría el vehículo, las extremidades aún unidas a los dos postes. La conclusión *a fortiori* es que al enfrentarse súbitamente el automóvil con el cable caído, en una curva cerrada de escaso margen de visibilidad, el poste de la derecha del teléfono ya estaba en el suelo. No implicamos con lo anteriormente dicho que si el cable hubiera estado suelto de uno de sus agarres no habría responsabilidad.

■ Asumiendo que en las circunstancias en que ocurrió el accidente en este caso los demandantes tenían la carga de probar la causa específica que causó el derribo, en ausencia de la intervención de un agente extraño; de un acto de fuerza mayor o no previsible, y de un defecto de instalación, la única inferencia que resulta racional y lógica de la evidencia tomada en un todo es que el poste partió debido a una condición propia, tal vez como la descrita por la prueba de los demandantes. En ausencia de los factores indicados, el hecho mismo de la rotura del poste tiende a desmentir cualquier inferencia de que estuviera en buenas condiciones. La situación no desemboca en un problema de credibilidad de un testigo u otro, sino en el balance más racional de toda una evidencia tomada en conjunto, *Sanabria* v. *Sucn. González*, 82 D.P.R. 885, 993 (1961); en el balance de la posibilidad de un hecho ante determinados factores contra su probabilidad.

■ No obstante lo dicho, los demandantes no venían obligados a demostrar la causa específica de la rotura ni tenían la carga de esa prueba. En sus circunstancias, el caso es uno típico en que procede que se aplique la máxima *res ipsa loquitur*, la cual una vez más acaba de ser expuesta en toda su proyección y amplitud por el compañero Hernández Matos en *Sociedad de Gananciales, Etc.*, v. *Presbyterian Hospital*, 88 D.P.R. 391 (1963) decidido hace 4 días, exposición que damos por reproducida con entera aplicación a la situación ante nos. Véanse, además, casos y autoridades ahí citados. En *Vda. de López* v. *García Espinosa*, 86 D.P.R. 702 (1962), expusimos

así el contenido de esa doctrina reducido a su mínima expresión: "La forma en que ocurrió el accidente descarta toda posibilidad de la aplicación de esta doctrina al caso, la que rige en aquellas situaciones en que un accidente que causa daño de ordinario no debe ocurrir y el agente que lo causa está bajo el dominio y gobierno de una persona, en cuyo caso la doctrina concede al perjudicado como un punto de partida la negligencia de esa persona." [Cita de casos.] Esa presunción inicial de culpa o negligencia, presentes determinadas circunstancias, la demanda y exige el deber social de no causar daño a otro—*alterum non laedere*—y la obligación de reparar el daño si se causa.—Art. 1802, Cód. Civil, ed. 1930—cf. *Ramos v. Carlo* 85 D.P.R. 353 (1962), y autoridades ahí citadas. De ordinario, los postes y cables de una compañía de servicio público instalados en la propiedad de uso público o la propiedad ajena, no deben caerse ni causar daño, abstracción hecha de una causa mayor no previsible—". . . . nadie responderá de aquellos sucesos que no hubieran podido preverse, o que previstos, fueran inevitables," Art. 1058 del Código Civil, ed. 1930—o de una causa interventora extraña imputable a tercero. Ese deber de no causar daño impone a las compañías que usan la propiedad de uso público o la propiedad ajena para la instalación de sus equipos, el máximo grado de inspección y vigilancia constante de sus instalaciones. (¹)

---

(¹) Como dice Castán, *Derecho Civil Español, Común y Foral,* Tomo 3, 8a. ed. 1954, pág. 146: "La esencia de la culpa está en la falta de diligencia y previsión que supone en el autor del acto."

Barassi, citado por Santa María, *Comentarios al Código Civil* (1956), Tomo 2, pág. 947, habla del deber general de corrección y de prudencia que impone la necesidad de una convivencia social ordenada en relación con los demás ciudadanos, y declara el acto ilícito en el sentido extracontractual cuando viola los deberes generales de corrección social o de conducta correcta, deberes que no están escritos en los códigos pero que representan el presupuesto mínimo sobreentendido del orden de la vida social, conceptos éstos que también citamos en *Ramos* v. *Carlo*, ante.

Véase *Brakensiek* v. *Nickles*, 227 S.W.2d 948, 950; y el extenso resumen de decisiones sobre el particular en la anotación que sigue a este caso en 28 *Negligence Compensation Cases Annotated* (*New Series*), págs. 281–437: "*Falling Electric Wires.*" Cf. *Friendship Telephone Co.* v.

■ A tenor del récord no surge que la aquí demandada controvirtiera adecuadamente la presunción de culpa o negligencia que surgía en su contra por la rotura y caída de este poste en las circunstancias expresadas. No demuestra su prueba el cumplimiento de aquel deber de inspección y vigilancia que venía obligada a observar y que podía haber evitado la ocurrencia de un hecho que de ordinario no debía acontecer. Contrario al criterio de la Sala sentenciadora, somos de opinión que la demandada debe responder de los daños causados en este accidente. Procederemos a dictar la sentencia que ella debió haber dictado.

De acuerdo con la evidencia en el récord no controvertida, se concederá:

(1) Al demandante Pascual Márquez la cantidad de $1,300 por daños reclamados en todos conceptos, incluyendo $500 por pérdida total del vehículo;

(2) A la demandante Lydia Agosto López, quien sufrió la fractura del peroné izquierdo, $6,500, incluyendo lucro cesante;

(3) A la menor demandante Lydia Esther Rivera, $2,500;

(4) A la menor Blanca Iris Rivera, $1,000;

(5) A la menor Ada Elba Agosto, $1,000;

---

*Russom* (Tenn.) 309 S.W.2d 416; *Union Gas & Electric Co.* v. *Waldsmith,* (Ohio) 166 N.E. 588; *Nichols* v. *City of Minneapolis,* (Minn.) 23 N.W. 868, 869 *in fine.*

Ante los riesgos del maquinismo avasallador de la sociedad moderna, se hace cada vez más irreconciliable en este tipo de actividades el hecho de un daño sufrido con la idea de que no sea remediado, en ausencia de un acto de Dios o de culpa del propio perjudicado o imputable a un tercero. Cf. *Green* v. *General Petroleum Corporation,* (Cal.) 270 Pac. 952, 954-55; Prosser, *"Strict Liability",* 2a. ed. 1955, págs. 315-349.

De ahí la tendencia tanto en la doctrina anglosajona como en la latina, producto del fenómeno económico-industrial moderno, hacia la responsabilidad objetiva en el caso típico, que hasta cierto punto nos parece ser sólo una versión más radical y avanzada de *res ipsa.* No obstante, debe ser claro que resolvemos el caso de autos por una negligencia racionalmente probada; o una negligencia racionalmente inferida bajo esa máxima, no controvertida por la demandada.

(6) A la demandante Pascuala López, madre de Lydia y Ada Elba Agosto, $1,000;

(7) A los demandantes Ramón Rivera y María de Jesús Delgado, padres (no casados) de las menores Lydia Esther y Blanca Iris Rivera, quienes vivían en compañía de sus hijas, $500 a cada uno.

*Se revocará la sentencia del Tribunal Superior y en su lugar se dictará otra en los términos expresados. Se impone a la demandada las costas del procedimiento incluyendo las de este recurso, y $1,500 de honorarios de abogado en el Tribunal de instancia.*