EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Gonzalo Rivera Colón<br><br>Peticionario<br><br>v.<br><br>David Díaz Arocho,<br>Gloria Otero Córdova y<br>La Sociedad Legal de<br>Gananciales por ambos<br>Compuesta, y otros<br><br>Recurrido | Certiorari<br><br>2005 TSPR 116<br><br>165 DPR \_\_\_\_ |

Número del Caso: CC-2004-694

Fecha: 26 de agosto de 2005

Tribunal de Circuito de Apelaciones:

        Región Judicial de Arecibo

Juez Ponente:

        Hon. Jorge L. Escribano Medina

Abogado de la Parte Recurrida:

        Lcdo. Frankie Jiménez Santoni

Abogados de la Parte Peticionaria:

        Lcdo. Juan Carlos Puig Hernández
        Lcdo. Osvaldo Puig Hernández
        Lcda. Ernestina Martínez Guevara

Materia: Daños y Perjuicios

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Gonzalo Rivera Colón

    Peticionario

        v.

David Díaz Arocho,                CC-2004-0694
Gloria Otero Córdova y
la Sociedad Legal de
Gananciales por ambos
Compuesta, y otros

    Recurrido

Opinión del Tribunal emitida por la Juez Asociada señora Rodríguez Rodríguez

San Juan, Puerto Rico, a 26 de agosto de 2005

Tenemos la ocasión para determinar si, probada la negligencia y el nexo causal con el daño, puede el titular de una finca afectada en sus recursos naturales reclamar compensación en daños y perjuicios al amparo del Artículo 1802 del Código Civil. De ser así, nos corresponde resolver cómo se caracteriza el daño a los recursos ambientales y cuál es el procedimiento adecuado para cuantificar el mismo. Examinemos detenidamente los hechos que dan lugar a este recurso.

**I**

El peticionario Gonzalo Rivera Colón, agricultor de profesión, es propietario de una finca localizada

en el Barrio Hato Viejo del Municipio de Ciales. Esta propiedad, de aproximadamente ciento treinta y ocho cuerdas (138.0479) de cabida, colinda por el noreste con dos inmuebles pertenecientes a los recurridos, David Díaz Arocho y su esposa Gloria Otero Córdova. La colindancia entre ambas propiedades está constituida por una elevación de aproximadamente trescientos (300) pies lineales verticales, formados por un farallón natural o frontón calizo que se extiende a lo largo del Río Manatí, entre los municipios de Ciales y Manatí. La finca del peticionario se ubica en la parte inferior de dicha elevación, mientras que las propiedades de los recurridos se ubican en la parte superior.

El peticionario adquirió la referida propiedad con el propósito de desarrollar áreas de recreación pasiva y activa; el cultivo de frutos menores, y la cría y pastoreo de ganado (agricultura general); y el desarrollo de bosques (ecoturismo). Con este ánimo, el señor Rivera edificó en un área de su propiedad un complejo, al que denominó Área Recreativa de Ciales, consistente en varias piscinas, salones de actividades y áreas recreativas. El señor Rivera obtenía ingresos por el alquiler de dichas facilidades. En otra parte de la finca se localiza un área de bosque de alrededor de treinta (30) cuerdas con caminos y veredas para fines ecoturísticos.

Durante los años 1990 a 1994, los recurridos realizaron en sus terrenos movimiento de material de

corteza terrestre, en virtud de un permiso otorgado por el Departamento de Recursos Naturales y Ambientales ("DRNA"). Ante una querella presentada en el DRNA en el año 1992, un oficial examinador determinó que los recurridos habían violado la operación del permiso al no tomar las medidas de seguridad necesarias para protección de la ciudadanía y así evitar el depósito de material y sedimentación en las áreas bajas y desagües naturales. Ya que no surgió del expediente que se hubiera solicitado al DRNA autorización para el uso de explosivos, el oficial examinador concluyó que el querellado quebrantó una prohibición expresa en el permiso en cuanto al uso de fulminantes.[1] Además, el oficial examinador precisó que algunas de las actividades de movimiento de corteza terrestre se efectuaron vencido el permiso del DRNA.

Mientras tanto, el DRNA emitió una orden contra el señor Díaz Arocho mediante la cual ordenaron se llevara a cabo trabajos preliminares de restauración en la propiedad del señor Díaz Arocho, específicamente en el borde del farallón y al pie del farallón en su parte baja. Para proceder con las labores de restauración se le ordenó al señor Díaz Arocho obtener del señor Rivera permiso de acceso a su propiedad para remover el material objeto del deslizamiento. El señor Rivera se negó a autorizar la entrada a su finca por entender que el daño sería mayor.

---

[1] Informe del Oficial Examinador, Departamento de Recursos Naturales y Ambientales, Apéndice del *Certiorari*, pág. 49.

Finalmente, el 15 de febrero de 1996 el Secretario del DRNA acogió el informe del oficial examinador y ordenó a los recurridos el pago de multas administrativas, ascendentes a cinco mil dólares ($5,000).[2]

Así las cosas, el 14 de agosto de 1996, el señor Rivera presentó demanda en daños y perjuicios contra el señor Díaz Arocho, su esposa y sociedad legal de gananciales, y varias aseguradoras. Adujo en la demanda que la utilización de equipo pesado y explosivos en el proceso de extracción de terreno tuvo consecuencias devastadoras en su propiedad, al ocasionar grandes desplomes de la pared de farallón que marca la colindancia. Estimó que los daños sufridos incluían la destrucción y completa inutilización de un área de bosque de alrededor de diez (10) cuerdas, incluyendo caminos y veredas; pérdida de hábitat de aves y otras especies de animales; destrucción de árboles; alteración del flujo natural de las aguas superficiales y subterráneas incluyendo manantiales; alteración y destrucción de cuevas y cavernas en la pared del farallón; interrupción e inutilización del área del bosque; interrupción del uso del área recreativa; y daño ecológico general.[3] En consecuencia se reclamó un millón cuatrocientos mil dólares ($1,400,000) en concepto de daños a la propiedad, daños morales y angustias mentales sufridas

---

[2] Resolución del Departamento de Recursos Naturales y Ambientales, Apéndice del *Certiorari*, pág. 35.
[3] Apéndice 1.d. Demanda Civil Núm. CDP1996-0235.

por el señor Rivera al ver destrozada parte de su propiedad y ver paralizados sus proyectos.[4]

Luego de varios incidentes procesales se celebró vista en los méritos en la que testificaron el señor Rivera, el perito Carlos Conde Costas, y el demandado señor Díaz Arocho.[5] Mediante su testimonio el señor Rivera describió en detalle su propiedad y todas las actividades cívicas allí celebradas previo a los derrumbes.[6] Testificó sobre los trabajos de extracción en las propiedades vecinas y

---

[4] Según surge de la demanda el desglose de los daños reclamados es el siguiente:

> "23.   El Demandante como consecuencia directa de la culpa o negligencia de los Codemandados, ha sufrido los siguientes daños:
>
> a) Daños a la Propiedad del Demandante:
> — destrucción y completa inutilización (sic) de un área de bosque de alrededor de 10, cuerdas incluyendo caminos y veredas ........................$200,000
> — pérdida de hábitat de aves y otras especies de animales, incluyendo árboles ..........$100,000
> — la alteración del flujo natural de agua superficial, subterránea y manantiales ...............$100,000
> — alteración y destrucción de cuevas y cavernas en la pared del farallón ............................$100,000
> — interrupción e inutilización del área del bosque  ..................................................$200,000
> — interrupción del uso del área recreativa .........$400,000
> — daño ecológico y escénico general ...............................$200,000
>
> b) Daño a la persona del Demandante
> — daños morales, sufrimientos y angustias mentales...................................................................$200,000"

[5] Las partes estipularon la exposición narrativa de la prueba testifical.  Véase Apéndice del *Certiorari*, pág. 413.

[6] En su testimonio mencionó distintos grupos cívicos que, además del público en general que visitaba el bosque, rentaban los recursos de la propiedad, como por ejemplo "Boys Scouts of America", grupos religiosos, usuarios de kayaks, y deportistas entre otros.

como éstos afectaron el disfrute de su propiedad, causándole daños físicos, económicos y angustias mentales.[7]

Además del testimonio del señor Rivera, la parte demandante presentó como perito al señor Conde Costas, director ejecutivo de Tierra Linda, Inc., corporación sin fines de lucro dedicada a estudios ecológicos y a promover la educación ambiental y el ecoturismo. El señor Conde testificó que en el año 1996 Tierra Linda, Inc. realizó un reconocimiento y evaluación ecológica del área impactada por el derrumbe en la parte del farallón localizada en la propiedad del demandante, que incluyó el área del bosque que ubica en la base de dicho farallón, dentro de la finca del señor Rivera. Para el análisis se utilizó personal técnico y especializado, quienes hicieron un estudio detallado de la geología, hidrología, fisiografía, geoestética, flora y fauna del lugar; y de cómo estas áreas quedaron adversamente afectadas por el derrumbe en la propiedad colindante. Se preparó un informe escrito que pormenorizó todos los hallazgos del mencionado estudio.[8] El perito manifestó la importancia ecológica y enfatizó el valor geoestético del área, la que identificó como refugio

---

[7] Surge de la Estipulación de la Exposición Narrativa de la Prueba Testifical que no se hizo inventario de los árboles afectados, tasación de la propiedad, estudio de daños económicos, ni se presentó prueba documental de pérdida de ingresos.

[8] El informe titulado, *Reconocimiento y Evaluación de Área Impactada por Derrumbe, Finca Rivera Colón, Barrio Hato Viejo, Ciales, Puerto Rico,* fue admitido en su totalidad en evidencia por el Tribunal de Primera Instancia. Véase Apéndice a la pág. 67.

de vida silvestre. Concluyó que el daño causado al paisaje cársico puede considerarse como permanente y que el área de bosque impactado tardaría alrededor de quince (15) años para recuperarse. La parte demandada no presentó prueba pericial para refutar la del demandante.

Así las cosas, el 31 de julio de 2003 el Tribunal de Primera Instancia dictó sentencia en la que declaró sin lugar la demanda y ordenó el archivo y sobreseimiento del caso. Sostuvo el tribunal sentenciador que el demandante no había presentado prueba suficiente para cuantificar los daños, por cuanto le era imposible conceder indemnización descansando en estimados verbales, en ausencia de prueba objetiva para sustentarlos. En apelación, el Tribunal de Apelaciones confirmó el dictamen bajo el mismo fundamento del tribunal de instancia; a saber, que a pesar de probarse la negligencia de los demandados y la existencia de los daños, no se probó su valor. Como resultado, rehusó fijar compensación "sobre bases especulativas y arbitrarias".

No conforme con la determinación del foro intermedio, el señor Rivera nos solicitó que revisemos la sentencia dictada a los efectos de concederle una indemnización justa y razonable por los daños probados a satisfacción del tribunal sentenciador. En su escrito presentó los siguientes señalamientos de error:

> 1. Erró el Tribunal de Apelaciones al confirmar la determinación del Tribunal de Primera Instancia al no conceder cuantía monetaria en carácter indemnizatorio, no obstante haberse probado los siguientes daños

alegados: daños ambientales, geoestéticos o escénicos y angustias mentales sufridas por el peticionario.

2. Erró el Tribunal de Apelaciones al concluir que era necesaria prueba objetiva para valorar el importe de los daños ambientales, geoestéticos o escénicos y las angustias mentales sufridas, reclamadas y probadas por el peticionario.

3. Erró el Tribunal de Apelaciones al confirmar la determinación del Tribunal de Primera Instancia al interpretar que el peticionario no aportó prueba sobre el importe de pérdida de ingresos.

Expedimos el auto solicitado y contando con la comparecencia de las partes, resolvemos.

## II

Por estar íntimamente relacionados, procedemos a discutir los señalamientos de error en conjunto.

El artículo 1802 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 5141, consagra la obligación de reparar daños causados mediando culpa o negligencia.[9] Al interpretar el referido artículo hemos señalado que para que surja la responsabilidad extracontractual deben concurrir los siguientes tres elementos: un daño, una acción u omisión negligente o culposa y, la correspondiente relación causal entre ambos. *Toro Aponte v. E.L.A.* 142 D.P.R. 464 (1997);

---

[9] El Artículo 1802 dispone:
El que por acción u omisión causa daño a otro, interviniendo culpa o negligencia, está obligado a reparar el daño causado. La imprudencia concurrente del perjudicado no exime de responsabilidad, pero conlleva la reducción de la indemnización. 31 L.P.R.A. sec. 5141.

*Ramírez v. ELA,* 140 D.P.R. 385 (1996) y otros casos allí citados.

La culpa o negligencia es la falta del debido cuidado que consiste en no anticipar y prever las consecuencias racionales de un acto, o la omisión de un acto, que una persona prudente y razonable habría previsto en las mismas circunstancias. *Ramos v. Carlo,* 85 D.P.R. 353 (1962); *Toro Aponte v. E.L.A., supra.* Existe un deber de conducta correcta, aunque no prescrita en los códigos, que constituye el presupuesto mínimo sobreentendido en el orden social. Son los tribunales los que habrán de determinar en qué consiste el deber de cuidado, tomando en cuenta las circunstancias de cada caso. *Ramos v. Carlo, supra.*

El concepto culpa del Artículo 1802 es infinitamente abarcador, tanto como lo suele ser la conducta humana, por cuanto ésta se analiza con amplitud de criterio. *Toro Aponte v. E.L.A.,* supra; *Santini Rivera v. Serv. Air, Inc.,* 137 D.P.R. 1 (1994); *Reyes v. Sucn. Sánchez Soto,* 98 D.P.R. 305 (1970). Conforme a nuestra tradición civilista, hemos adoptado como medida del deber de cuidado el estándar objetivo del buen padre de familia; que corresponde a la persona prudente y razonable en el derecho común anglosajón. Bajo ese estándar, se exige la diligencia que emplearía un ser humano promedio, frente a las mismas circunstancias, para prever el daño y tomar medidas para evitar ese resultado dañoso. *Valle Izquierdo v. E.L.A.,*

res. el 14 de mayo de 2002, 157 D.P.R. ___, 2002 T.S.P.R. 64.

El elemento de la previsibilidad está intrínsicamente relacionado al de la causalidad. En nuestra jurisdicción rige la doctrina de la causalidad adecuada para determinar si, de hecho, existe algún tipo de relación entre el daño causado y el acto culposo o negligente. Conforme a esta doctrina, se considera causa aquella condición que ordinariamente produciría el daño según la experiencia general; cuando ese daño aparece como consecuencia razonable y ordinaria del acto. *Toro Aponte v. E.L.A., supra; Soto Cabral v. E.L.A.,* 138 D.P.R. 298 (1995); *Torres Trumbull v. Pesquera,* 97 D.P.R. 338 (1969). La relación causal --elemento imprescindible en una reclamación en daños y perjuicios-- es un elemento del acto ilícito que vincula al daño directamente con el hecho antijurídico.

### III

Con el anterior trasfondo doctrinal sobre la responsabilidad extracontractual, pasemos a analizar si procede su aplicación en el marco de derecho ambiental.

La protección del medio ambiente representa una preocupación de importancia trascendental en el ámbito mundial por sus implicaciones humanas, sociales y económicas. Es política pública de los estados proteger el disfrute de un medio ambiente que fomente el desarrollo de la persona y una mejor calidad de vida. C.J. Lorente Aznar, *Empresa, Derecho y Medio Ambiente,* Editorial Bosch,

Barcelona, España, 1996, pág. 18.  El medio ambiente, como
concepto, no se circunscribe a los recursos naturales y
organismos vivos; sino que abarca otra serie de aspectos
culturales, históricos, y arqueológicos, entre otros.
*Íbid.*

La normativa ambiental es una de las más amplias,
complejas y diversas áreas de Derecho, ya que tiene
implicaciones de naturaleza administrativa, penal o civil.
Por la multiplicidad de vertientes que abarca, en las
últimas décadas se han aprobado normas constitucionales y
legislado un sinnúmero de estatutos y disposiciones a nivel
internacional en aras de proteger el ambiente.[10]

En nuestro ordenamiento la protección de los recursos
naturales ostenta rango constitucional. Los constituyentes,
preocupados por la conservación de nuestros recursos,
consideraron necesario recoger expresamente el deber
ineludible de proteger el medio ambiente, así como el
derecho de todo ser humano al goce y disfrute de los

---

[10] A manera de ejemplo, en la doctrina angloamericana
existen varios estatutos federales que reconocen la
facultad de valorar el daño ecológico y ordenar a la parte
actora a indemnizarlo.  Son los más importantes el
"Comprehensive Environmental Response, Compensation, and
Liability Act" (CERCLA), 42 U.S.C. sec. 9607(a); el "Clean
Water Act" (CWA), 33 U.S.C. sec. 1321(f)(4)-(5); y el "Oil
Pollution Act" (OPA), 33 U.S.C. sec. 2702(a).  Cada una de
estas piezas legislativas lleva apareada reglamentación que
conceptúa diferentes y complejos modelos de cuantificación
para identificar y estimar los daños ambientales y así
determinar la compensación adecuada.  Esta reglamentación
se conoce como "National Resources Damage Assessment"
(NRDA) y en términos generales está diseñada con el
propósito principal de reestablecer los recursos naturales
a su condición natural de no haber ocurrido el daño.

recursos naturales.  4 *Diario de Sesiones de la Convención Constituyente* 2622 (1952).  A tales efectos, el Artículo VI de la Constitución del Estado Libre Asociado en su sección 19 preceptúa que "[s]erá política pública del Estado Libre Asociado la más eficaz conservación de sus recursos naturales, así como el mayor desarrollo y aprovechamiento de los mismos para el beneficio general de la comunidad." Esta cláusula categórica e incondicionada no deja lugar a dudas que en nuestra jurisdicción salvaguardar el ambiente es política pública de carácter ineludible.  Este mandato dual impone el deber de lograr la más eficaz conservación de los recursos naturales a la vez que promueve su desarrollo para el beneficio de la ciudadanía general. Véase *Misión Industrial de Puerto Rico v. Junta de Calidad Ambiental,* 145 D.P.R. 908 (1998); *Colón Cortés v. Pesquera,* 150 D.P.R. 724 (2000).

Para implantar adecuadamente este mandato, durante las últimas décadas se han legislado una serie de mecanismos tutelares.  En el año 1970 se aprobó la Ley sobre Política Pública Ambiental, Ley Núm. 9 de 8 de junio de 1970, 12 L.P.R.A. sec. 1121 *et seq.*, con el fin primordial de brindar contenido procesal y sustantivo a la disposición constitucional, y en cuya virtud surgió la Junta de Calidad Ambiental. Posteriormente, se aprobó importante legislación ambiental[11] y se formó un complejo esquema agencial para

---

[11] Entre estas leyes se encuentran, además de la Ley de Política Pública Ambiental, la Ley Orgánica del

reglamentar lo relacionado a la protección de los recursos naturales y el disfrute del medio ambiente.[12] Véase *Colón Ventura v. Méndez*, 130 D.P.R. 433 (1992).

Siendo la temática del derecho ambiental tan diversa, los planteamientos relacionados al medio ambiente se evalúan de acuerdo a la naturaleza de la reclamación. Ante reclamaciones civiles, en la doctrina angloamericana, la litigación ambiental privada sobre daños ambientales se circunscribe a reclamaciones basadas en el derecho de propiedad. En estas situaciones se reclama por daño físico a recursos ambientales como árboles, cosechas o animales de los que sea posible probar un derecho propietario. Son muy pocas las ocasiones en que una parte afectada puede acreditar interés propietario en recursos naturales como el aire, agua, especies marinas o vida silvestre, para fundamentar un reclamo en daños por estos recursos. C.B. Anderson, *Damage to Natural Resources and the Costs of Restoration*, 72 Tul. L. Rev. 417, 419 (1997).[13]

---

Departamento de Recursos Naturales, Ley Núm. 23 de 20 de junio de 1972; la Ley de Bosques, Ley Núm. 133 de 1ro de julio de 1975; la Ley para Reglamentar la Extracción de Corteza Terrestre, Ley Núm. 132 del 25 de junio de 1968; la Ley de Cuevas y Cavernas, Ley Núm. 111 de 12 de julio de 1985; la Nueva Ley de Vida Silvestre de Puerto Rico, Ley Núm. 241 de 15 de agosto de 1999; entre otras leyes especiales.

[12] Además de la legislación local, la legislación federal también es de aplicación a Puerto Rico. Como resultado, es tan abundante la legislación ambiental existente que el estudio de esta rama del derecho es uno sumamente complejo.

[13] No obstante, como discutiremos más adelante, cuando el daño recae sobre recursos naturales existentes en la propiedad del perjudicado, se contempla la indemnización por daños por la interferencia con el disfrute de la

En la jurisdicción norteamericana, acreditado el interés propietario, las reclamaciones por daños ecológicos pueden basarse en varias teorías de derecho común, entre ellas estorbo ("nuisance")[14], trasgresión ("trespass")[15], responsabilidad absoluta[16], o negligencia. Cuando el reclamo es por negligencia, es determinante establecer los elementos para probar una relación causal entre la conducta del demandado y el daño experimentado; conforme al estándar de cuidado de la persona razonable. Véase *Alegría v. Payonk*, 619 P.2d 135 (Idaho 1980); *Brizendi v. Nampa-Meridian Irrig. Dist.*, 548 P.2d 80 (Idaho 1976). El

_____

propiedad (daños morales). Véase *Alonso v. Hills,* 214 P.2d.50 (Cal.App. 1950); *Nitram Chemicals v. Parker,* 200 So.2d 220 (Fla.App. 1967).

[14] Las reclamaciones por "nuisance" se fundan en la interferencia irrazonable con el uso y disfrute de la propiedad y constituyen la causa más común en demandas privadas de carácter civil por daños con implicaciones ambientales. Véase *Patz v. Farmegg Products, Inc.,* 196 N.W.2d 557 (Iowa 1972); *Mel Foster Co. Properties v. AMOCO*, 427 N.W.2d 171 (Iowa 1988); *Frank v. Environmental Sanitation Management, Inc.,* 687 S.W.2d 876 (Mo. 1985).

[15] Una acción por trasgresión consiste en un reclamo ante una invasión ilegal intencional a la propiedad. Véase *Curry Coal Co. v. M.C. Arnoni Co.,* 266 A.2d 678 (Pa. 1970); *Regan v. Cherry Corp.,* 706 F.Supp. 145 (D.R.I. 1989).

[16] En estas situaciones se impone responsabilidad independientemente de la conducta del actor, de acuerdo a los elementos proscritos en el *Restatement (Second) of Torts*, secciones 519 y ss. Este tipo de reclamación en la litigación ambiental se limita a daños tóxicos o que involucren sustancias radioactivas. Véase *Crawford v. National Lead Co.,* 784 F.Supp. 439 (S.D.Ohio 1989); *Department of Environmental Protection v. Ventron Corp.,* 468 A.2d 150 (N.J. 1983); *Branch v. Western Petroleum,* 657 P.2d 267 (Utah 1982).

elemento de causalidad se prueba bajo los mismos criterios tradicionales que gobiernan las reclamaciones torticeras.[17]

De igual modo en España, la materia de responsabilidad civil medioambiental alcanza su aplicación práctica bajo el precepto general del Artículo 1902 del Código Civil de España, el cual corresponde a nuestro Artículo 1802. La interpretación de la doctrina y la jurisprudencia española para este tipo de planteamientos se inspira en gran parte en el principio de la culpa de dicho artículo. En épocas más recientes se distingue cierta influencia de los preceptos de la responsabilidad absoluta, que considera procedente la indemnización independientemente de la culpa.[18] No obstante esta reciente tendencia, en la gran mayoría de los casos en que se invoca la protección del medio ambiente en la esfera del derecho sustantivo privado, se requiere la ocurrencia de responsabilidad que emane de forma más o menos directa de la voluntad del actor. J. Santos Briz, *La responsabilidad civil, temas actuales,* Editorial Montecorvo, S.A., Madrid, España, 2001, págs. 88-98.

---

[17] Resulta necesario probar los siguientes elementos para que prospere la acción: un deber legal existente de ajustarse a cierto estándar de conducta; que el actor falló en conformarse a ese estándar; un nexo causal entre la conducta negligente y el daño; y un daño a los intereses del reclamante. *O'Neal v. Department of the Army,* 852 F.Supp. 327 (M.D.Pa. 1994); *Jacques v. First Nat'l Bank,* 515 A.2d 756 (Md. 1986).

[18] Cabe destacar que estos supuestos de responsabilidad absoluta --en los que sólo se excluye responsabilidad por circunstancias de fuerza mayor-- se dan ante reclamos particulares al amparo del Artículo 1908, nuestro Artículo 1808, 31 L.P.R.A. sec. 5147.

En nuestra jurisdicción, ya anteriormente habíamos expresado que nuestro Artículo 1802 constituye una norma general para reparar todo tipo de daño ilícito, "incluso cuando la actuación culposa contraviene intereses garantizados por la Constitución." *Bonilla v. Chardón,* 118 D.P.R. 599, 611 (1987). Por tanto, conforme a la discusión que antecede, resolvemos que en nuestra jurisdicción una acción civil al amparo del Artículo 1802 es un mecanismo adecuado para que una persona privada reclame por daños cuando éstos ocurren a los recursos medioambientales existentes en su propiedad como consecuencia de un acto negligente de otro, independientemente de los mecanismos provistos en la legislación especial.[19]

A estos efectos, definimos el daño ambiental, al que denominamos indistintamente como daño ecológico, como aquel daño "sufrido[s] por el medio ambiente que, como consecuencia de accidentes humanos, más o menos voluntarios, afecta[n] el equilibrio natural." J. Santos Briz, *La responsabilidad civil, supra,* pág. 107. (Para la

---

[19] Es importante aclarar que existen mecanismos alternos en virtud de legislación especial que provee expresamente al ciudadano una causa de acción civil. A manera de ejemplo, el Artículo 19 de la Ley sobre Política Pública Ambiental dispone que:

Cualquier persona natural o jurídica podrá llevar acciones en daños y perjuicios en los tribunales de justicia contra cualquier otra persona natural o jurídica basada en daños que sufran por violaciones a las secs. 1121 a 1140a de este título. Esta acción civil será independiente y diferente de los procesos administrativos que se sigan en la Junta. 12 L.P.R.A. sec. 1139.

definición de "medio ambiente" véase discusión *supra*, a la pág. 11.)  En este tipo de acción será indispensable probar los elementos necesarios para establecer la responsabilidad extracontractual, específicamente: una acción negligente u omisión del supuesto responsable, un daño ecológico o deterioro causado a los recursos ambientales existentes en la propiedad privada, y una relación de causalidad entre ambos.   La responsabilidad civil resultante no será objetiva sino que dependerá de que se pruebe la negligencia del demandado.

**IV**

**A.**

Habida cuenta que la responsabilidad civil conlleva precisamente el deber de resarcir a la parte perjudicada por el daño causado, procede determinar cómo se caracteriza el daño ambiental, para así poder valuar la indemnización adecuada para la parte afectada.   En este análisis no podemos perder de vista que, al ser un estatuto reparador, el Artículo 1802 debe interpretarse liberalmente para lograr su propósito.  Véase *Dorante v. Wrangler,* 145 D.P.R. 408 (1998); *Muñoz Hernández v. Policía de P.R.,* 134 D.P.R. 486 (1993).

Como ya indicamos, uno de los elementos de la responsabilidad extracontractual es un daño causado.  Luis Díez-Picazo define el daño como "el menoscabo que a consecuencia de un acaecimiento o evento determinado sufre una persona ya en sus bienes vitales o naturales, ya en su

propiedad o en su patrimonio". L. Díez-Picazo, *Derecho de Daños,* Ediciones Civitas S.A., Madrid, España, 1999, a la pág. 307. Según bien refleja la anterior definición, al igual que el concepto de "culpa", el concepto de "daño" resulta ser sumamente abarcador, por la variedad de matices que abarca. J. Santos Briz, *La responsabilidad civil, supra*, pág. 146.

Nuestro ordenamiento jurídico reconoce la existencia de dos tipos de daños. *Cintrón Adorno v. Gómez,* 147 D.P.R. 576 (1999). Por un lado se encuentran los daños especiales --también conocidos como daños físicos, patrimoniales, pecuniarios o económicos--, que son toda aquella pérdida que recae sobre bienes objetivos. Estos daños admiten valoración económica por impactar directamente el patrimonio del perjudicado. J. Santos Briz, *Derecho de Daños,* Editorial Revista de Derecho Privado, Madrid, España, 1963, pág. 120.

De otro lado, existen los llamados daños morales que son los infligidos a las creencias, los sentimientos, la dignidad, la estima social o la salud física o psíquica del perjudicado. Es decir, son los daños que lesionan "los derechos de la personalidad o extra patrimoniales." R. De Ángel Yagüez, *La Responsabilidad Civil*, Universidad de Deusto, Bilbao, España, 1988, pág. 224. En igual sentido, M. Carneiro, *Método de Valuación del Daño Moral*, Ed. Hammurabi, Buenos Aires, Argentina, 2001, pág. 61 ("El daño moral es de naturaleza extrapatrimonial, emocional y

simbólica.  Se exterioriza por el sufrimiento, el dolor y la humillación."); A. Borrell Macias, *Responsabilidades Derivadas de la Culpa Extracontractual Civil*, Ed. Bosch, Barcelona, España, 1955, 2da ed., pág. 211.  El daño moral lesiona los bienes no económicos de la persona pero, a pesar de no recaer directamente sobre el patrimonio, indirectamente podrían repercutir en éste, causando una perturbación anímica en su titular.  *Cintrón Adorno v. Gómez, supra.*

Por su naturaleza heterogénea no pueden ser clasificados con carácter exhaustivo.  La doctrina identifica entre estos daños, los daños propiamente morales, --que no afectan de modo alguno el patrimonio-- y los daños morales impropios, llamados también daños patrimoniales indirectos --que trascienden a valores del patrimonio.  Santos Briz, *Derecho de Daños, supra*, págs. 120-122.  Además, nos comenta Santos Briz que "[p]uede hablarse también de daños morales derivados de daños patrimoniales, así por ejemplo el dolor moral que produce la pérdida de una joya familiar; de daños morales derivados de dolores físicos o de enfermedades físicas o mentales, **y de daños morales concomitantes con daños patrimoniales o a la inversa.**  Todos ellos tienen de común producir perturbaciones anímicas (disgusto, desánimo, desesperación, pérdida de la satisfacción de vivir, etcétera), pero derivan de motivos distintos."  *Íbid*, pág. 122.

En *Paoli Méndez v. Rodríguez,* 138 D.P.R. 449 (1995), afirmamos que "[e]l medio ambiente natural y la naturaleza no sólo sirven el propósito de que el hombre pueda utilizarlos para su subsistencia material, sino para su recreación y uso del tiempo libre, para la contemplación de su belleza y majestuosidad, para sentirse orgulloso de su patria, para mejorar su calidad de vida, y para lograr un desarrollo integral de la personalidad y su autorrealización como ser humano." *Paoli Méndez v. Rodríguez, supra*, págs. 462-463. De acuerdo a la apreciación que hiciéramos en *Paoli*, **resolvemos que el daño ambiental, cuando tiene la naturaleza de daño a un paisaje con valor ecológico que afecta la propiedad del reclamante, debe caracterizarse como un daño moral.**

Ahora bien, en la medida en que el daño ambiental afecte el patrimonio del perjudicado, deberá considerarse el mismo como daño especial. En consecuencia, concluimos que este tipo de daño ambiental tiene la naturaleza de daño moral concomitente con daño patrimonial. Como veremos, esta distinción tiene efectos prácticos al momento de valuar la compensación, según discutimos a continuación.

**B.**

**i.**

La doctrina civilista admite dos posibilidades para reparar un daño: la reparación *in natura* o reintegración específica, siendo ésta la solución ideal; o la indemnización monetaria, la alternativa cuando el

restablecimiento al estado natural no es posible. De Ángel Yagüez, *op. cit.*, pág. 321. Le corresponde al tribunal determinar la forma en que procede la reparación considerando las características particulares de cada caso. *Rodríguez Cancel v. A.E.E.*, 116 D.P.R. 443 (1985). Véase también H.M. Brau del Toro, *Daños y perjuicios extracontractuales en Puerto Rico,* Segunda Edición, Publicaciones JTS, San Juan, Puerto Rico, 1986, págs. 430-431. Cabe señalar que hemos reconocido que la estricta aplicación de la norma de reparación *in natura* resulta de difícil --y en ocasiones imposible-- aplicación,[20] lo que generalmente lleva a los tribunales a optar por la alternativa de la indemnización en dinero, que resulta menos compleja. *Rodríguez Cancel v. A.E.E., supra.*

Conforme a lo anterior, cuando no es posible la reintegración resulta imperativo asignar una cuantía económica al daño sufrido. Debemos apuntar que el daño debe ser resarcido íntegramente. Previamente nos hemos expresado sobre la angustiosa función que tienen los tribunales al estimar y valorar los daños. *Rodríguez Cancel v. A.E.E., supra.* Conceder cuantías insuficientes

---

[20] El tratadista Ricardo De Ángel Yagüez, en *La Responsabilidad Civil*, Universidad de Deusto, Bilbao, España, 1988, pág. 321, nos indica:
> La reparación en forma específica consiste en la remoción de la causa del daño y en la realización de la actividad necesaria para reponer las cosas o bienes dañados en su estado primitivo. Puede ocurrir, desde luego, que una y otra finalidad sean imposible o que resulten ya inútiles o insatisfactorias, o que requieran la intervención insustituible e inalcanzable de un tercero.

en concepto de daños tiene el efecto de aminorar la responsabilidad civil a la que debe estar sujeta el causante del daño; mientras que conceder daños exagerados conlleva un elemento punitivo, no reconocido por nuestro ordenamiento. Por tanto, al adjudicar la cuantía, el tribunal debe procurar alcanzar una razonable proporción entre el daño causado y la indemnización otorgada. *Nieves Cruz v. Universidad de Puerto Rico,* 151 D.P.R. 150 (2000).

Ante reclamaciones de daños físicos a la propiedad es necesario que el demandante provea al tribunal los datos necesarios para poder cuantificar el daño reclamado y así fijar la indemnización correspondiente. *Sánchez v. Cooperativa Azucarera*, 66 D.P.R. 346 (1946). En efecto, al reclamar daños especiales, nuestro ordenamiento jurídico requiere que se detalle el concepto de las partidas afectadas para así cuantificar toda consecuencia al patrimonio. 32 L.P.R.A. Ap. III R.7.4.[21] **Sin embargo, hemos reiterado que, aún ante daños especiales, el derecho a ser compensado no se derrota por el carácter especulativo de la reclamación.** *Sociedad de Gananciales v. F.W. Woolworth & Co., 143 D.P.R. 76 (1997); Odriozola v. S. Cosmetic Dist. Corp.,* 116 D.P.R. 485 (1985). Aun presente cierto grado de incertidumbre, el tribunal podrá, conforme a los hechos particulares del caso, la prueba presentada y los criterios establecidos, determinar una cuantía

---

[21] La Regla 7.4 de Procedimiento Civil dispone que "[c]uando se reclamen daños especiales, se detallará el concepto de las distintas partidas".

razonable para indemnizar al perjudicado por los daños sufridos. *Rivera v. Tiendas Pitusa*, 148 D.P.R. 695, 700 (1999); *Publio Díaz v. E.L.A.*, 106 D.P.R. 854 (1978).

Por otro lado, la determinación o cuantificación de daños morales, tarea que ha sido descrita como uno de los "desafíos más delicados que plantea hoy la tarea judicial", no debe descansar en datos materiales y prueba puramente objetiva. R. Pizarro, *El Daño Moral*, Ed. Hammurabi, Buenos Aires, Argentina, 2004, 2da ed., pág. 436. Es un ejercicio que tolera cierto grado de especulación ya que descansa, a mayor grado que los daños especiales, en elementos subjetivos como lo son la discreción, el sentido de justicia y la conciencia humana del juzgador de los hechos. *Rodríguez Báez v. Nationwide Ins. Co.,* res. el 18 de abril de 2002, 156 D.P.R. ___, 2002 T.S.P.R. 52; *Urrutia v. A.A.A.,* 103 D.P.R. 643 (1975).

Ahora bien, al valuar y mensurar los daños el juzgador debe hacerlo en estricta correlación con la prueba presentada, procurando mantener un sentido remediador sin aproximarse al elemento punitivo. *Sociedad de Gananciales v. F.W. Woolworth*, *supra*. En *Hernández Fournier*, 80 D.P.R. 93, 103 (1957), dispusimos que para que proceda una reclamación por daño moral "es imprescindible probar sufrimientos y angustias morales profundas y no bastaría una pena pasajera como base de la acción." Por cuanto hemos reiterado que el reclamante debe proveer evidencia que sustente que realmente quedó afectado en su salud,

bienestar y felicidad.  Véase *Ramos Rivera v. E.L.A.*, 90 D.P.R. 828 (1964); *Moa v. E.L.A.*, 100 D.P.R. 573 (1972); *Blas v. Hospital Guadalupe*, 146 D.P.R. 267 (1998).

El daño moral no se puede convertir en una fuente de lucro indebido para el damnificado y en motivo de expoliación para el dañador, lo que ocurre "cuando este último es obligado a reparar daños morales, inexistentes, que no guardan relación causal adecuada con el hecho generador, o lo que es más frecuente, cuando se encubre bajo el ropaje de daño moral a daños patrimoniales que no han sido probados en juicio." Pizarro, *op. cit.*, pág. 432.

**ii**.

La complejidad inherente a la cuantificación de daños en una reclamación al amparo del Artículo 1802 es patente cuando se reclaman daños ecológicos a recursos naturales existentes en una propiedad privada.  Estudiosos del derecho ambiental en España destacan que ocurrido el daño ambiental se hace normalmente imposible la reparación *in natura*.  Siendo así, la jurisprudencia española en materia civil de daño ambiental tiende hacia el resarcimiento directo de daños a la propiedad o a la salud.  No obstante, por las cualidades inherentes a los recursos naturales, no está claramente definido qué elementos son compensables y cuáles son los métodos de valoración apropiados.  Distinto ocurre en el campo penal o administrativo donde la tendencia es hacia la reparación.  M. Cuiñas Rodríguez, Acerca de la tutela del ambiente en el derecho español, en

*Daños – medio ambiente, salud, familia, derechos humanos,*
Editores Rubizal-Culzoni, Buenos Aires, Argentina, 2000,
pág. 144.

Igualmente, en los Estados Unidos la legislación de
carácter administrativo busca la restauración
("restoration") cuyo objetivo es devolver los recursos
naturales a la condición original ("baseline"). [22]
Restauración es el término colectivo utilizado para
referirse a los costos asociados a toda actividad dirigida
a rehabilitar, reemplazar o adquirir el equivalente
funcional al recurso ecológico afectado. Véase S. Master,
Natural Resource Damage Assessment, 2000 Natural Resources
Env´t, 114, 118; *Anderson v. Salling Concrete Corp.*, 411
N.E.2d 728 (Ind. 1980). Pero, cuando se trata de un
reclamo torticero, no hay una fórmula determinada para
calcular el daño sino que los tribunales varían
considerablemente sobre la manera de determinar su valor y
el tipo de prueba necesaria para adjudicarlos. Cada caso
se examina de forma independiente y de acuerdo a sus hechos
particulares. *Casinos v. Union Oil Co.,* 14 Cal. App. 4th
1770 (Cal. App. 1993); *Givens v. Markall,* 124 P.2d 839
(Cal. App. 1942) ("There is no fixed rule with respect to
the measure of damages for injuries to, or destruction of
property in every case. The amount to be awarded depends
upon the character of the property and the nature and
extent of the injury, and the mode and amount of proof must

---

[22] CERCLA sec. 9607(f)(1).

be adapted to the facts of each case.") En el sano ejercicio de su discreción, el tribunal debe permitir a un propietario recobrar indemnización no sólo por la pérdida de uso de la propiedad, sino además por otras lesiones como alteraciones al estado anímico y enfermedades físicas. *Board of County Comm'rs v. Slovek,* 723 P.2d 1309 (Col. 1993).

Para llevar a cabo esta función los tribunales en la jurisdicción norteamericana han esbozado diferentes modelos de cuantificación de daños. El mecanismo de restauración, utilizado generalmente en la esfera administrativa, tiene cabida en reclamos civiles cuando los daños son de carácter temporero y de naturaleza tal que permitan regresar la propiedad a su estado original. En estos casos la compensación consiste en el costo de la reparación. *Horsch v. Terminix Int'l Co.* 865 P.2d 1044 (Kan. App. 1993). Otro modelo consiste en indemnizar de acuerdo a la disminución en valor ("diminution in value rule"), que se calcula comparando la diferencia en el valor de la propiedad justo antes y justo después del daño. *McAlister v. Atlantic Richfield Co.,* 662 P.2d 1203 (Kan. 1983); *Bayley Products, Inc. v. American Plastic Products Co.,* 186 N.W.2d 813 (Mich. App. 1971). Este segundo modelo se utiliza por lo general cuando el daño a la propiedad es permanente, pero no la destruye en su totalidad. Sin embargo, un reclamo sobre propiedad inmueble no necesariamente puede caracterizarse como permanente. Para que se considere

permanente no es necesario que el daño dure para siempre; es suficiente que sea una pérdida irreparable para el propietario. *Hudson v. Peavey Oil Co.,* 566 P.2d. 175 (Or. 1977). También, por lo general se usa el modelo de disminución en valor cuando el daño es continuo o recurrente, como lo sería la contaminación industrial. *Razzano v. Kent,* 177 P.2d 612 (Cal. App. 1947).

En ocasiones los tribunales utilizan una teoría híbrida —que contempla tanto el costo razonable de reparación como la regla de disminución en valor. En este caso el cálculo de la merma en valor se hace luego de la reparación, compensándose así bajo ambos modelos. Para que proceda este modelo híbrido es necesario que el demandante pruebe que las medidas remediales no lograron devolver la propiedad a su anterior valor en el mercado. Véase *Wiese-GMC, Inc. v. Wells,* 626 N.E.2d 595 (Ind. App. 1993); *Terra-Products, Inc. v. Kraft General Foods, Inc.,* 653 N.E.2d 89 (Ind. App. 1995).

Ahora bien, cabe la posibilidad que el valor en el mercado de la propiedad no haya experimentado una reducción luego del daño. Ante esta situación, los tribunales reconocen que muchas áreas de considerable valor ecológico tienen muy poco o ningún valor comercial, de manera que una aplicación literal del modelo de disminución en valor dejaría al reclamante carente de remedio. Es improcedente en estos casos cuantificar la compensación utilizando modelos comerciales basados en el valor en el mercado.

*Commonwealth of Puerto Rico v. SS Zoe Colocotroni,* 628 F.2d 652, 674 n. 21 (1st Cir. 1980). ("The diminution rule has itself been limited in cases where the property has a special value to the injured party that is not reflected in its market value.")

Un tercer modelo de cuantificación de daños consiste en calcular el valor de la pérdida de uso de la propiedad. Este método generalmente usa como base el valor rentable de la propiedad --valor que hubiera podido rentarse a no ser por el daño ambiental. Este modelo está supeditado a condiciones de valor comercial, con las desventajas ya mencionadas. *Spaulding. v. Cameron,* 239 P.2d 625 (Cal. 1952). Otro método, denominado costo de reemplazo, provee una alternativa viable cuando resulta razonable obtener sustitución para los elementos afectados, y así compensar la pérdida. Este mecanismo resulta apropiado cuando es posible reemplazar la fauna o vegetación con nuevas especies. El mismo se utiliza para restaurar bosques o especies de animales que no se entienda que puedan regenerarse naturalmente en un término razonable de tiempo. *Commonwealth of Puerto Rico v. SS Zoe Colocotroni, supra*, pág. 677.

Como mencionamos, la cuantificación del daño depende en gran medida de la naturaleza de la propiedad destruida o lesionada. Ocasionalmente la pérdida afecta elementos adheridos al suelo, que pueden valorarse independientemente del terreno. En estos casos, procede cuantificar estos

elementos por separado. El tribunal determinará, en su sana discreción, si procede indemnizar por los elementos individuales, por el valor del terreno o una combinación de ambas. *Restatement (Second) of Torts* sec. 929(2)(1977); *Wilson v. Brand S. Corp.*, 621 P.2d 748 (Wash. 1980). Si se trata de arbustos, árboles frutales, setos o pozos, resulta poco práctico cuantificarlos por separado, y debe el análisis limitarse a otros modelos. *Restatement (Second) of Torts* sec. 929(2) Comment f (1977).

Un último método de cuantificación de daño ambiental contempla indemnización por daños morales que resulten directa o indirectamente del daño ecológico. *Alonso v. Hills,* 214 P.2d 50 (Cal.App. 1950)*; Nitram Chemicals, Inc. v. Parker,* 200 So.2d 220 (Fla.App. 1967).

Cabe destacar que los mecanismos antes descritos no constituyen un listado exhaustivo. Pueden existir otros métodos razonables y científicamente adecuados para estimar daños ambientales cuando la completa restauración no sea posible. *Commonwealth of Puerto Rico v. SS Zoe Colocotroni, supra*, n. 24.

De lo anterior se desprende la miríada de métodos que se han identificado en la doctrina para valuar y mensurar el daño ambiental que ocasiona un menoscabo o una lesión a la propiedad de un reclamante. Cuál es el apropiado para medir el daño dependerá de la naturaleza, extensión y carácter del daño o lesión sufrida. En otras palabras, esa determinación se tomará caso a caso; y, la prueba necesaria

para establecer los daños dependerá de los hechos del caso. Lo que si está claro en la normativa es que en un caso de esta naturaleza cabe una reclamación tanto por los daños especiales como por los morales.

Resolvemos por lo tanto, que en una acción civil por daño ambiental al amparo del Artículo 1802 en la que se reclaman daños a la propiedad, o a los recursos naturales de ésta, el tribunal tiene a su disposición varios mecanismos para cuantificar el daño de manera que se logre una compensación adecuada. El objetivo principal deberá ser devolver la propiedad al estado existente antes del daño. Somos conscientes sin embargo que, por lo general, la restauración del área afectada resultará físicamente imposible o desproporcionadamente onerosa; en cuyo caso, no es factible utilizar el mecanismo de la restauración. Cuando ello ocurra, se deberá acudir a otros modelos de valuación de daños como los previamente discutidos.

Los tribunales tienen gran discreción para escoger el modelo a utilizarse, determinación que dependerá en gran medida, de la naturaleza del daño ambiental reclamado --**sea éste moral, patrimonial o una combinación de ambos**-- y las características de la propiedad. Independientemente del modelo a adoptarse, la valoración del daño debe ser razonable, proporcionada al daño ambiental sufrido y a los valores ecológicos perjudicados. *Commonwealth of Puerto Rico v. SS Zoe Colocotroni, supra*. Evidentemente, quien reclame el daño tiene que probarlo y, como hemos indicado

en otro contexto, el estimado que haga el demandante del daño y la evidencia que presente a esos fines, no requiere precisión matemática. *Elba A.B.M. v. U.P.R.,* 125 D.P.R. 294, 321 (1990). Probados los elementos de la responsabilidad extracontractual, el hecho que exista cierto nivel de especulación en la prueba no debe ser óbice para proveer al reclamante un remedio adecuado.

Cuando el daño a resarcir sea moral, es menester que quien lo reclame especifique en qué consiste el mismo y cómo le ha afectado. Necesariamente entonces, el tribunal deberá sopesar entre otros, los siguientes aspectos: 1) La personalidad del damnificado y su particular grado de sensibilidad, visto desde la perspectiva del interés afectado. Esto es extremadamente importante, pues los daños morales nacen de la lesión sufrida en el componente psíquico-emocional del perjudicado. 2) Los intereses lesionados. 3) La naturaleza de la lesión sufrida. 4) El efecto del transcurso del tiempo sobre la lesión, bien como factor coadyuvante para agravar o mitigar el daño moral acaecido. 5) En casos apropiados, la divulgación pública que haya tenido el hecho dañoso. 6) Y, las circunstancias que rodearon el acto que causó el daño, incluyendo la intencionalidad del agente y los medios empleados para causar el daño. Pizarro, *op. cit.*, pág. 430; Carneiro, *op. cit.*, págs. 61-106. Hay que señalar que el daño moral, es en esencia, la modificación disvaliosa en la subjetividad del damnificado derivada de la lesión a un interés no

patrimonial que se traduce en un modo de estar diferente y anímicamente perjudicial al que se tenía antes del hecho.

## V

Analicemos los hechos particulares del caso a la luz del derecho antes expuesto.

Según concluyó el Tribunal de Primera Instancia en sus determinaciones de hechos "[e]n el 1990 el Señor Díaz empezó a sacar material de la corteza terrestre en una de sus propiedades y tiró material a la propiedad del demandante causando que se tapara el Río Manatí, destrozó parte del bosque; afectó como tres cuerdas en el 90; afectó el farallón; se dañaron los caminos; destruyó parte de las facilidades del área recreativa, cayeron muchísimas piedras en la propiedad de Rivera, algunas aves no volvieron; se taparon las cuevas en el farallón; **es un desastre que no se puede calcular**; en el 1994 se afectaron como seis cuerdas."[23] (Énfasis nuestro.) Por su parte el Tribunal de Apelaciones reiteró que conforme la sentencia y determinaciones de hechos del tribunal de instancia los daños alegados en la demanda fueron debidamente probados. Sin embargo, entendió el foro *a quo* que de la totalidad del expediente no surgía "algo que permita conceder alguno de los daños específicos reclamados."

Luego de estudiar detenidamente el expediente del caso, la evidencia presentada y la exposición narrativa de

---

[23] Véase Sentencia del Tribunal de Primera Instancia, Sala Superior de Arecibo, 31 de julio de 2003, Apéndice del *Certiorari* a la pág. 410.

la prueba, coincidimos plenamente con el tribunal sentenciador **únicamente** en que los actos de los recurridos constituyeron un desastre incalculable a los recursos medioambientales de la propiedad del señor Rivera. No compartimos, como no comprendemos, la determinación de los foros inferiores de no adjudicar los daños y desestimar la demanda bajo el fundamento de ausencia de prueba que sustentase los mismos. Dicha conclusión es claramente insostenible y errónea.

No albergamos duda en nuestra mente, a base del récord de este caso, que los daños morales sufridos por la parte demandante como resultado del daño ecológico que las acciones negligentes del demandado causaron **en la propiedad del señor Rivera**, quedaron plenamente probados. Es incomprensible que ninguno de los dos foros si quiera hubiese hecho referencia a los mismos. Los daños morales en este caso fueron probados. Solo resta valuar los mismos; función para la cual los tribunales están plenamente capacitados. Recalcamos, el elemento de subjetividad es inmanente a la propia naturaleza del daño moral; no por ello, sin embargo, el mismo se torna imposible de cuantificar.

Por otro lado y respecto los daños especiales, debemos consignar que lo cierto es que la prueba presentada no fue la más idónea y descansó principalmente en el testimonio del demandante. Además, el desglose de los daños en la demanda tiene claros visos de hiper-valuación. Ahora bien,

el testimonio del demandante, creído como fue, ofrece base suficiente para poder cuantificar, con cierto grado de objetividad, el monto de **algunos** de los daños especiales reclamados.[24] El Tribunal de Primera Instancia impuso la onerosa carga al peticionario de probar la cuantía de sus daños especiales con certeza matemática, criterio que ha sido expresamente rechazado por esta Curia. Habida cuenta que estamos ante daños ambientales que ocurrieron hace más de diez (10) años, este es un caso claro en el que la reparación *in natura* no es una alternativa factible. Tampoco es viable computar el daño bajo el modelo de disminución en valor, ya que según el testimonio del peticionario, la propiedad ha experimentado un incremento en su valor en el mercado, que no refleja el valor de los recursos ecológicos. Estimamos que con la prueba que obra en el expediente puede razonablemente calcularse la cuantía del daño utilizando una combinación del valor de pérdida de uso y costo de reemplazo. Para este cómputo deben utilizarse como base los estimados brindados por el peticionario en su testimonio así como la prueba pericial.

Por los fundamentos anteriormente expuestos se devuelve el caso al Tribunal de Primera Instancia para que proceda a determinar la compensación adecuada en proporción

---

[24] Conforme lo antes expresado, el Tribunal de Primera Instancia deberá reevaluar su determinación de no conceder partida por el daño especial de pérdida de ingreso; al igual que por los demás daños físicos sufridos en la propiedad del demandante, según éstos surgen del informe pericial.

al daño sufrido, de conformidad con los principios expuestos en esta Opinión. En la determinación final de la compensación a conceder, el tribunal de instancia deberá considerar si el peticionario, al negarle acceso al demandado a su finca para que éste llevase a cabo los trabajos de restauración que fueron ordenados por el Departamento de Recursos Naturales, incurrió en negligencia comparada. De concluir en la afirmativa, el tribunal deberá proceder a reducir del monto total de la compensación el porcentaje correspondiente a su negligencia.

Se dictará la sentencia correspondiente.


                              Anabelle Rodríguez Rodríguez
                                   Juez Asociada

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Gonzalo Rivera Colón

    Peticionario

       v.

David Díaz Arocho,            CC-2004-0694
Gloria Otero Córdova y
la Sociedad Legal de
Gananciales por ambos
Compuesta, y otros

    Recurrido

SENTENCIA

San Juan, Puerto Rico, a 26 de agosto de 2005

Por los fundamentos expuestos en la Opinión que antecede, los cuales se incorporan íntegramente a la presente, se devuelve el caso al Tribunal de Primera Instancia para que continúen los procedimientos acorde con lo aquí resuelto.

Lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Asociado señor Fuster Berlingeri disiente con opinión escrita. Los Jueces Asociados señor Rebollo López y señor Rivera Pérez no intervinieron.

Aida Ileana Oquendo Graulau
Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Gonzalo Rivera Colón       *
     Demandante-Peticionario     *
                               *
        vs.                   *
                               *
David Díaz Arocho, Gloria Otero   *
Córdova y Otros              *        CC-2004-694
     Demandados-Recurridos      *
                               *
        vs.                      *
                               *
Royal and Sunalliance Ins. Co.    *         Certiorari
     Codemandada y Tercera      *
     Demandante                  *
                               *
        vs.                      *
                               *
Drillex S.E. y su Aseguradora     *
General Accident Insurance Co.    *
     Tercera-Demandada         *
                               *
* * * * * * * * * * * * * * * * * *

Opinión Disidente emitida por el Juez Asociado señor FUSTER BERLINGERI.

San Juan, Puerto Rico, a 26 de agosto de 2005.

En el caso de autos, tanto el foro de instancia como el foro apelativo se negaron a indemnizar al demandante por los daños que sufrió, por la sencilla razón de que éste **no presentó evidencia alguna sobre el valor concreto de tales daños**. Dichos foros concluyeron ambos que el demandante, en efecto, sufrió daños. Sus dictámenes rehusando conceder alguna compensación al demandante no se basaron en que la propiedad del demandante no hubiese sido perjudicada por los actos negligentes del demandado. Se basaron más bien en el hecho de que **el demandante no aportó ninguna prueba que permitiese al tribunal valorizar los daños en cuestión**.

El siguiente pasaje de la sentencia del Tribunal de Apelaciones indica claramente el fundamento de su decisión en el caso de autos:

> "... **no encontramos en los autos algo que permita conceder alguno de los daños específicos reclamados, pues <u>aunque probada su existencia</u>, no se probó su valor.**
>
> **En efecto, en el expediente encontramos afirmaciones sobre el uso no autorizado de explosivos y remoción de terreno por parte de los apelados, así como del desprendimiento de terreno sobre la propiedad del apelante y la descripción de los cambios en el flora, fauna y geoestética del paisaje; los que se atribuyen como posible efecto de la perturbación ocasionada por los derrumbes. No obstante, no surge de la prueba, aun tampoco del informe del perito del apelante, elementos que nos permitan determinar el impacto causado a la propiedad o datos de clase alguna que nos permitan hacer un cómputo de la suma que debió recibir el apelante. Tampoco encontramos evidencia que sostenga la cuantía del importe reclamado en concepto de pérdida de ingresos, ya que no se aportó evidencia del beneficio económico percibido antes de los derrumbes; así como nada encontramos sobre los daños que se reclama sufrieron las estructuras existentes en la finca, <u>lo cual pudo haber sido suplido mediante tasaciones o estudios donde se valorizaran los daños específicos causados a la estructura o su depreciación</u>. En consideración a lo anterior, no podemos fijar el menoscabo causado a los ingresos o propiedades del apelante, ya que actuaríamos necesariamente sobre bases especulativas y arbitrarias si fijáramos una compensación sin evaluar esos elementos...**
>
> **En el caso ante nuestra consideración, <u>el apelante no aportó prueba sobre el importe de los daños sufridos</u>, por lo que nos encontramos impedidos de variar la determinación del TPI de no conceder a éstos una cuantía monetaria en carácter indemnizatorio." (Énfasis suplido)**

Frente a esta situación de carencia evidenciaria, procedía **confirmar** los dictámenes *a quo*. Como se sabe, nuestro sistema de derecho es uno de carácter adversativo

y de naturaleza rogada. Prevalece, en general, el principio elemental de que le toca al reclamante en un pleito el peso de la prueba con respecto a sus alegaciones. El demandante tiene la obligación de poner al juzgador en condiciones de determinar los daños y perjuicios que ha sufrido. Matos v. Adm. Servs. Médicos de P.R., 118 D.P.R. 567 (1987); Cotto v. C.M. Ins. Co., 116 D.P.R. 644 (1985); Asoc. Auténtica Empl. v. Municipio de Bayamón, 111 D.P.R. 527 (1981); Vaquería Garrochales Inc. v. A.P.P.R., 106 D.P.R. 799 (1978). Veáse, además, Cuevas Segarra, *La Responsabilidad Civil y El Daño Extracontractual en P.R.*, Cap. VI.

Reiteradamente hemos reconocido la dificultad que presenta en ocasiones la tarea de aquilatar daños y por ende, la latitud discrecional que tiene el juzgador de los hechos para realizar esa difícil tarea. **Pero en todo caso, dicha tarea se tiene que realizar sobre la base de la prueba sobre el particular aportada en el juicio**. Veáse, Riley v. Rodríguez de Pacheco, 119 D.P.R. 762 (1987); Meléndez v. Lebrón Rodríguez, 111 D.P.R. 45 (1981); Canales Velázquez v. Rosario Quilés, 107 D.P.R. 757 (1978); Moa v. E.L.A., 100 D.P.R. 573 (1972); Concepción Guzmán v. AFF, 92 D.P.R. 488 (1965); Baralt v. Baéz, 78 D.P.R. 123 (1955). **Si no se presenta prueba alguna sobre uno de los elementos de la acción, como sucedió aquí con respecto al valor de los daños sufridos, no procede la reclamación**.

La mayoría en su opinión, en lugar de reiterar esta conocida normativa, opta por otro curso de acción. En lugar

de confirmar la correcta decisión de los foros *a quo,* se dedica más bien a crear una **controvertible**[25] acción **privada** por daños a recursos medioambientales al amparo del Art. 1802 del Código Civil; y a proclamar aun más **controversialmente**[26]

---

[25] En vista de que la Sec. 19 del Art. VI de nuestra Constitución dispone que será política pública en el país el aprovechamiento de los recursos naturales **"para el beneficio general de la comunidad"**, cabe preguntarse si procede en Puerto Rico una acción torticera para beneficio de una persona particular por daños a recursos naturales. ¿Dónde queda entonces la reparación del interés público? Véase, Salas Soler v. Srio. de Agricultura, 102 D.P.R. 724 (1974). La mayoría del Tribunal no examina esta esencial cuestión.

Tampoco examina la cuestión correlativa de si tal acción **privada** procede independientemente del recurso natural en cuestión. Así pues, ¿procede tal acción **privada** cuando la pérdida no es de un recurso **"escénico"**, como el que resalta la mayoría aquí, sino de otros recursos naturales de mayor valor propiamente ecológico que trascienden una finca en particular, como cuando se trata del hábitat de determinada fauna o flora que se extiende por una región que abarca numerosas fincas particulares; o un manantial que nace y fluye por varios lugares? ¿Qué sucede cuando se trata de un recurso natural que sólo tiene una presencia pasajera en la finca privada, como aves migratorias o tortugas que vienen a anidar allí?

[26] A parte del hecho de que el uso por la mayoría aquí de la figura del "daño moral" **no tiene precedente alguno en nuestra jurisprudencia**, si acaso lo contrario, cabe preguntarse si ese "daño moral" es uno genérico que sufrimos todas las personas en el país cuando se afecta un recurso natural que es parte de nuestro patrimonio común, o si se trata como parece creer la mayoría de un daño que sufrió sólo el demandante. En tal caso, ¿**qué prueba existía aquí de que éste en efecto experimentó subjetivamente tal daño**, más allá del pesar natural que siente cualquiera por el menoscabo de una propiedad valiosa, que reiteradamente hemos resuelto que no es indemnizable? Soegard v. Concretera Nacional, Inc., 88 D.P.R. 179 (1963); Díaz v. Palmer, 62 D.P.R. 111 (1943); Díaz v. Cancel, 61 D.P.R. (1943). ¿Cómo sabemos que el reclamante aquí tenía una sensibilidad ambiental especial como para sufrir un daño moral particular por la acción menoscabante de un recurso natural?

Por otro lado, no queda claro tampoco porqué un daño ambiental, que por su naturaleza propia es de ordinario y medularmente un **daño material**, deba resarcirse **primordialmente** como un **daño moral**.

que se trata de una acción para resarcir **un daño moral** sufrido por el dueño de la finca deteriorada, que consiste en esencia en:

> "... la modificación disvaliosa en la subjetividad del damnificado derivada de la lesión a un interés no patrimonial que se traduce en un modo de estar diferente y anímicamente perjudicial al que se tenía antes del hecho."

La mayoría del Tribunal entiende que con tales pautas, el foro de instancia puede calcular la cuantía del daño sufrido por el demandante. En efecto, la mayoría instruye al foro de instancia a utilizar para ello una combinación del método de valor de pérdida de uso y del método de costo de reemplazo. Se ordena la utilización de tales medios para calcular el monto de los daños en el caso de autos, a pesar de que estos métodos **no corresponden de modo alguno** al singular daño moral que se ha de resarcir.

Yo, por mi parte, estimo que en el caso de autos no se presentó prueba que le permita al tribunal *a quo* llevar a cabo una evaluación razonable de los daños probados. Los equívocos pronunciamientos de la mayoría del Tribunal en su opinión hacen aun más difícil realizar tal evaluación.

Tampoco entiendo porqué la mayoría, si desea darle una inusitada segunda ocasión al demandante para presentar ahora su prueba sobre el valor de los daños sufridos, no lo hace pautando precisamente el tipo y medios de prueba que serían procedentes para lograr la cotización debida de los singulares daños presentes en este caso.

En lugar de seguir algunos de los cursos decisorios referidos, la mayoría del Tribunal opta por **idear** una nueva causa de acción en nuestro derecho sobre la responsabilidad extracontractual, **sin ofrecer a la vez una justificación suficiente para ello aquí, ni presentar una conceptualización clara y coherente de tal causa de acción**. Este proceder es particularmente sorprendente en vista de que la mayoría del Tribunal reconoce en su propia opinión que en otras jurisdicciones daños como los que aquí nos conciernen se dilucidan mediante reclamaciones basadas en el derecho de propiedad. Esa realidad ha debido servir de precaución a la mayoría en cuanto a aventurarse a abrir brechas rudimentarias en casos como el de autos.

Es por todo lo anterior que no estoy conforme con la opinión mayoritaria y por ello, disiento.


                                        JAIME B. FUSTER BERLINGERI
                                             JUEZ ASOCIADO